**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-00342-NYW-CYC

GERALD PAUL HERSHFELDT,

Plaintiff,

v.

CARLEEN JOHNSTON, individually and in her official capacity; JENNIFER BRANT, individually and in her official capacity; TIMOTHY J. JASHINSKY, individually and in his official capacity; CINDY LUCERO, individually and in her official capacity; WENDY BATTS, individually and in her official capacity; ARTHUR J. SPICCIATI, individually and in his official capacity; LARRY BOYD, individually and in his official capacity; JANE RODIG, individually and in her official capacity; HEATHER O'HAYRE, individually and in her official capacity; MICHELLE BARNES, in her official capacity; LAURIE GILL, in her individual capacity; MATT ALTHOFF, in his official capacity; LARIMER COUNTY, COLORADO; and DOE DEFENDANTS 1-10,

Defendants.

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

## I. PRELIMINARY STATEMENT

1. This is a civil rights action under 42 U.S.C. § 1983 and the Fair Credit Reporting Act, 15 U.S.C. § 1681, to remedy a decade of unconstitutional child support enforcement executed without a valid judicial predicate and the willful suppression of Plaintiff's creditworthiness.

2. The foundation of this suit is the state court's own official record. On June 9, 2015, the court adopted the parties' Separation Agreement and entered the Decree of Dissolution, but it did so on one express condition: that the parties provide the Social Security Numbers for the children. The next day, June 10, 2015, the court's own system documented that the condition was not met, outputting: "UNABLE TO ENTER SUPPORT ORDERS AS WE ARE MISSING SSN FOR CHILDREN." Because the condition was never satisfied, no executable child support order was ever entered. Human actors proceeded with enforcement anyway. The constitutional violations alleged here arise from that administrative conduct, not from any state-court judgment.

3. Plaintiff does not ask this Court to declare any state-court order void ab initio, overturn any state-court judgment, or review the correctness of any state-court ruling. Plaintiff challenges executive and administrative enforcement conduct — property seizures and liberty deprivations executed without a lawful judicial predicate and without constitutionally required process. Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).

## II. JURISDICTION, VENUE, AND STANDING

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a)(3) and (4). Plaintiff's claims arise under 42 U.S.C. § 1983 and the FCRA, 15 U.S.C. § 1681. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events occurred in this District and the Colorado Defendants reside and perform their official duties here.

5. Plaintiff has standing under Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992). The following concrete, particularized injuries were directly caused by Defendants' conduct and are redressable by this Court: (a) unlawful seizure of $37,337.42 in net credited funds, documented in the Family Support Registry Complete Payment Record for Account XXXXX17-01; (b) unlawful seizure of $12,440 during the period January 2022 through August 2023, when 45 C.F.R. § 303.11(b)(12) prohibited collection; (c) suspension of Plaintiff's Colorado driver's license on multiple occasions without a Turner-compliant hearing, including July 2018, July 2023, and February 2026; (d) suppression of Plaintiff's FICO credit score to 461 through willful furnishing of false credit information; (e) two periods of homelessness totaling approximately seventeen months — June 2023 through November 15, 2024, and January 29, 2026 through May 29, 2026, the latter period ending upon Plaintiff's acceptance into the Denver Rapid Rehousing Program; (f) loss of his daughter E.H.'s planned placement with him in July 2023, caused by the financial depletion and housing loss resulting from Defendants' conduct; and (g) severe emotional distress, mental anguish, and loss of enjoyment of life.

6. Defendant Larimer County is a municipal entity not entitled to Eleventh Amendment sovereign immunity. Monell v. Dep't of Social Services, 436 U.S. 658 (1978). Defendant Spicciati's October 20, 2025 state-court filing — captioned "The People of the State of Colorado, through Arthur J. Spicciati, Assistant Larimer County Attorney" — and his statement that the local child support division "represents the State of Colorado" establishes state action for § 1983 purposes without transforming the County into an arm of the State for Eleventh Amendment purposes.

**III. PARTIES**

7. Plaintiff Gerald Paul Hershfeldt is a resident of Denver County, Colorado, proceeding pro se.

8. Defendant Carleen Johnston is the Child Support Manager for Larimer County Department of Human Services (LCDHS), sued individually and in her official capacity. On December 2, 2025, Johnston responded to Plaintiff's written notice of enforcement-caused homelessness by providing a link to the 988 Suicide and Crisis Lifeline without pausing the enforcement or initiating an ability-to-pay review.

9. Defendant Jennifer Brant is a Senior Child Support Specialist and Supervisor for LCDHS, sued individually and in her official capacity. On February 5, 2025, Brant stated in writing that enforcement is based exclusively on "policy and procedures," overriding obligee waivers and private agreements, and that an active wage garnishment was already in place that guaranteed payment at the time enforcement remedies were pursued.

10. Defendant Timothy J. Jashinsky is a Lead Child Support Technician for LCDHS, sued individually and in his official capacity. On July 7, 2022, Jashinsky stated in a written internal communication that he credited the obligee with overnights for a child in 24/7 residential treatment because she needed to "maintain her home to take care of the child when the child is released from the treatment facility."

11. Defendant Cindy Lucero is a Child Support Specialist II for LCDHS, sued individually and in her official capacity. On November 13, 2025, Lucero issued a manual payment demand one day after Plaintiff filed a protected state court motion. On March 18, 2026, Lucero authorized a license suspension notice one day after U.S. Marshals executed federal service in this action.

12. Defendant Wendy Batts is a Child Support Technician II for LCDHS, sued individually and in her official capacity. Batts forwarded to Plaintiff the July 7, 2022 internal communication

concerning the worksheet calculation and stated in writing that the agency does not "get involved in any parenting time issues" during modification proceedings. The identity of the individual who entered the June 2, 2022 ICON register entry (Event ID 000031) is not established in the present record and is among the matters subject to discovery.

13. Defendant Arthur J. Spicciati is an Assistant County Attorney for Larimer County, sued individually and in his official capacity. On October 20, 2025, Spicciati filed a state-court response captioned "The People of the State of Colorado," confirming state action for § 1983 purposes.

14. Defendant Larry Boyd is a Supervisor for the South Dakota Division of Child Support, sued individually and in his official capacity. On June 4, 2025, Boyd stated in writing that South Dakota shares employment information with Colorado "so they can enforce."

15. Defendant Jane Rodig is a Lead Child Support Specialist for the South Dakota Division of Child Support, sued individually and in her official capacity. On January 13, 2025, Rodig mailed Form DSS-SE-466A to Plaintiff's Colorado employer at 4704 Harlan Street, Suite 220, Denver, Colorado 80212, invoking SDCL 25-7A-56.5 to compel disclosure of Plaintiff's wages and employment status.

16. Defendant Heather O'Hayre is the Director of LCDHS and the final policymaking authority for child support enforcement in Larimer County, sued individually and in her official capacity. On February 5, 2026, O'Hayre issued a formal written response identifying the Separation Agreement as the enforcement predicate, characterizing the June 10, 2015 ICON output as "simply the notation of the court clerk regarding a purely administrative function," and concluding the agency had "acted appropriately."

17. Defendant Michelle Barnes is the Executive Director of the Colorado Department of Human Services, sued in her official capacity for prospective relief. Plaintiff submitted formal complaints to the Colorado Department of Human Services regarding the enforcement, including a written complaint filed November 14, 2025 and acknowledged by the Department on November 20, 2025, which were not resolved. As the official with authority over the statewide child support enforcement apparatus, Barnes is a proper defendant for prospective injunctive and declaratory relief under Ex parte Young, 209 U.S. 123 (1908).

18. Defendant Laurie Gill is the former Cabinet Secretary of the South Dakota Department of Social Services, sued in her individual capacity for compensatory and punitive damages for conduct undertaken during her tenure as final policymaker.

19. Defendant Matt Althoff is the current Cabinet Secretary of the South Dakota Department of Social Services, substituted in his official capacity pursuant to Fed. R. Civ. P. 25(d) solely for prospective injunctive and declaratory relief. This substitution does not affect the individual-capacity claims against Defendant Gill.

20. Defendant Larimer County, Colorado, is a municipal entity liable under Monell for enforcement customs formally ratified by Director O'Hayre on February 5, 2026, and by the Board of County Commissioners in a 2-0 vote on March 24, 2026.

21. Doe Defendants 1-10 are currently unidentified actors who created or authorized the June 2, 2022 ICON register entry (Event ID 000031) styled "Child Support Order-1st," and are subject to substitution upon identification through discovery.

**IV. STATEMENT OF FACTS**

***A. The Separation Agreement and the June 9-10, 2015 Conditional Sequence (Exhibits 1, 2, 3)***

22. On March 4, 2015, Plaintiff and his former spouse filed a Separation Agreement and Parenting Plan in Larimer County District Court Case No. 2015DR000229. Section 2.1 of the Separation Agreement contained blank Social Security Number fields for both minor children, reading "XXX-XX-____," while the same instrument recorded both parents' full Social Security Numbers at paragraph 1.4 — a contrast confirming the omission was specific to the children. Section 2.5.1 directed that Plaintiff pay child support directly to the obligee. Section 2.5.5 provided that child support payments "will be made through an income assignment" requiring activation through the court. No income assignment was ever validly activated, because the June 10, 2015 ICON system event identified the missing statutory prerequisite that prevented entry of the support order through which an income assignment would issue.

23. In plain terms: on June 9, 2015, the court approved the parties' Separation Agreement and granted the divorce, but it required one thing before child support orders could be entered — the parties had to provide the children's Social Security Numbers. The next day, the court's own system recorded that this had not happened, and that support orders therefore could not be entered. Because that condition was never met, no enforceable child support order was ever issued. Plaintiff followed the Separation Agreement and paid the obligee directly, exactly as the parties had agreed and as the court approved in the Decree. The official record bears this out across four entries. The ICON Register of Actions for Case No. 2015DR000229 records a single conditional sequence across two days. On June 9, 2015 (Event ID 000014), the court reviewed and adopted the Separation Agreement and entered the Decree, while simultaneously imposing a condition stated in the minute order itself: "PARTIES WILL PROVIDE SSN FOR ALL MEMBERS OF THE FAMILY." The provision of the children's Social Security Numbers was

thus a condition that had to be satisfied for the support orders to be entered. On June 10, 2015 (Event ID 000020), the court's own system documented that the condition was not met: "UNABLE TO ENTER SUPPORT ORDERS AS WE ARE MISSING SSN FOR CHILDREN; REQUESTED OF PARTIES IN COURT ON 6/9/15." The June 10 entry does not override or nullify the June 9 proceeding; it completes the record of it, documenting that the condition imposed on June 9 was never fulfilled and that the support orders therefore never ripened into entered, executable orders. The full record sequence is: Event ID 000004 (Separation Agreement filed March 4, 2015); Event ID 000014 (the June 9 conditional minute order); Event ID 000018 (the Decree of Dissolution filed June 10, 2015, signed by Magistrate Linda K. Connors); and Event ID 000020 (the June 10 documentation that the support orders could not be entered). No executable child support order was created in Case No. 2015DR000229 on June 9 or June 10, 2015, or at any time thereafter.

24. In her February 5, 2026 written response, Director O'Hayre identified the enforcement predicate as "the Decree of Dissolution of Marriage which… incorporates the Separation Agreement and Parenting Plan filed on March 4, 2015 which addressed child support." The Separation Agreement she identified as the enforcement predicate is the same document whose blank SSN fields in Section 2.1 correspond to the ICON system's June 10, 2015 rejection output.

25. The June 9, 2015 minute order (ICON Event ID 000014) records a support figure of $1,028 per month. Section 2.5.1 of the Separation Agreement records $1,128 per month. This $100 per month variance between the court's own minute order and the underlying Agreement is documented across the minute order, the Agreement, and the county ledger. The court's adopted instruction — direct payment — governed Plaintiff's performance obligation.

26. Plaintiff complied with the direct-payment agreement, paying the obligee directly from July 2015 through early 2017. The Family Support Registry Complete Payment Record reflects a FSR transition date of December 27, 2017, and no payment entries before July 17, 2018, leaving the period July 2015 through mid-2018 without any FSR enforcement entry — consistent with the direct-payment arrangement and the absence of any activated income assignment, which the June 10, 2015 ICON rejection had prevented.

***B. Credit Reporting: June 9, 2015 Through Present (Exhibits 12, 13, 14, 15)***

27. On June 9, 2015, a Colorado child support tradeline was furnished to Experian with a "Date Opened" of June 9, 2015 — one day before the ICON system outputted its rejection of the support order entry on June 10, 2015.

28. In August 2021, Plaintiff disputed the Colorado child support tradeline. Following that dispute, the furnisher certified the disputed information as accurate without correction.

29. In April 2025, Plaintiff submitted a second formal dispute. Experian Report Number 0414-6940-52 reflects that following the April 2025 dispute, the furnisher certified the information as accurate ("Remains") without correction.

30. At no time from June 9, 2015 to present has the State of South Dakota held jurisdiction over Plaintiff, nor has a valid judicial predicate at any time warranted credit reporting by the State of Colorado or South Dakota. On or about February 2021, Defendants Boyd and Rodig reported a new child support account entry to TransUnion, reflecting an account origin date six years after the original 2015 tradeline. On or about September 2021, Boyd and Rodig reported a second new account entry to TransUnion, reflecting a further change in the reported account origin date.

31. The February 7, 2026 Equifax credit report for Plaintiff reflects an outstanding balance of $15,049 and an "Amount Past Due" of $700.00 marked "OVER 120 DAYS PAST DUE," active after the filing of this federal action.

***C. Interstate Enforcement Without Registration (Exhibits 9, 10, 11)***

32. On June 10, 2015, the obligee relocated to South Dakota with the children. Section 2.2 of the Separation Agreement prohibited either parent from relocating in a manner that substantially changed the parties' geographic ties without either a written agreement between the parties or an order of the court; the record reflects neither preceding the relocation. South Dakota did not register any Colorado support order pursuant to UIFSA, 28 U.S.C. § 1738B, before interstate enforcement activity was initiated, because no such order has ever existed.

33. On June 4, 2025, Defendant Boyd stated in writing: "if we gain any information, we share that with Colorado so they can enforce."

34. On January 13, 2025, Defendant Rodig mailed Form DSS-SE-466A to Plaintiff's Colorado employer at 4704 Harlan Street, Suite 220, Denver, Colorado 80212, invoking SDCL 25-7A-56.5 to compel disclosure of Plaintiff's wages and employment status. Calder v. Jones, 465 U.S. 783 (1984); Dudnikov v. Chalk & Vermilion Fine Arts, 514 F.3d 1063 (10th Cir. 2008).

35. On July 17, 2018, the Family Support Registry recorded its first garnishment extraction from Plaintiff's wages — nearly three years after the June 9, 2015 tradeline opening and during a period when no executable child support order had been entered in Case No. 2015DR000229. Defendant Larimer County's own enforcement technician confirmed the pre-2022 enforcement timeline in writing: in a May 22, 2023 email (Re: CP MOD), Susan Martens stated, "We have

been enforcing your case since 9/2021" — nine months before the June 2, 2022 ICON entry that the register itself classifies as the "1st" child support order.

***D. The June 2, 2022 ICON Register Entry (Exhibits 2, 4)***

36. On June 2, 2022, an entry styled "Child Support Order-1st" was made in the ICON register for Case No. 2015DR000229 (Event ID 000031), carrying an ordered amount of $622.00, a commence date of June 5, 2022, and an arrearage amount listed as $0.00. The identity of the individual who created this entry is not established in the present record and is among the matters subject to discovery; Doe Defendants 1-10 include the actor or actors responsible. The entry bears the classification label "1st." The meaning of that label is a matter for construction in light of the surrounding record, which contains no earlier child support order entry in the ICON Register of Actions.

37. The metadata for Event ID 000031 reflects that the Filing ID, Authorizer, and Filing Party fields were listed as "N/A." No judicial officer is identified as the authorizing party for this entry.

38. At the time Event ID 000031 was entered, the Family Support Registry ledger reflected $6,638.00 in outstanding arrears. Event ID 000031 listed the arrearage at issuance as $0.00. The record reflects an internal inconsistency between the ICON entry and the FSR ledger at the time of the entry.

39. The Register of Actions for Case No. 2015DR000229 reflects both an "Order Modifying Child Support" by Judge Linda K. Connors and an entry carrying the "Child Support Order-1st" classification label on the same date, June 2, 2022. The county ledger separately references an "ORDER DATED 06/09/2015." Plaintiff alleges that the June 9, 2015 reference corresponds to the minute order (ICON Event ID 000014), which the June 10, 2015 system output (Event ID

000020) identifies as not having resulted in an entered support order. To the extent the June 2, 2022 entry operated as a modification, Colorado's void-modification doctrine provides that a modification of an order never entered cannot supply a retroactive predicate for the preceding period. People v. District Court, 713 P.2d 918, 921 (Colo. 1986).

40. Plaintiff requested the original 2015 child support order from the Larimer County Combined Courts Records Department. After a 34-day search, the Records Department produced the June 2, 2022 "Order Modifying Child Support." No 2015 order was produced.

***E. Residential Care, Status Inversion, and the $12,440 Seizure (Exhibits 6, 8)***

41. From January 2022 through August 2023, Plaintiff's minor daughter E.H. was placed in 24/7 state-funded residential treatment. Federal regulation 45 C.F.R. § 303.11(b)(12) prohibits state child support agencies from collecting support from the obligor and remitting it to the obligee when the child is receiving state-funded care.

42. In April 2023, South Dakota designated Plaintiff as E.H.'s adoption subsidy payee, recognizing Plaintiff as the custodial resource in anticipation of E.H.'s discharge to his Colorado home. E.H.'s treatment team and Plaintiff had planned for E.H. to be discharged to Plaintiff's Colorado home at the end of July 2023.

43. During the residential placement period, Defendants continued to garnish Plaintiff's wages as a non-custodial obligor, seizing $12,440 during a period when 45 C.F.R. § 303.11(b)(12) prohibited such collection and South Dakota had designated Plaintiff as the custodial payee for E.H.'s adoption subsidy.

44. In a July 7, 2022 internal communication forwarded to Plaintiff by Defendant Batts, Defendant Jashinsky stated that he credited the obligee with overnights for a child in 24/7

residential treatment in another state because she needed to "maintain her home to take care of the child when the child is released from the treatment facility." The obligee had no documented overnights with E.H. at that time. Jashinsky applied Worksheet A (Sole Physical Care) to the modification calculation. Defendant Batts stated in writing that the agency does not "get involved in any parenting time issues" during modification proceedings.

***F. License Suspensions, Financial Harm, and Loss of E.H. Placement (Exhibits 5, 20, 22)***

45. From January 2022 through July 2023, the $12,440 seized during E.H.'s residential placement period depleted Plaintiff's available financial resources. In May 2023, Plaintiff sent formal written notice to LCDHS that he was out of unemployment funds, imminently facing homelessness, and needed his driver's license to begin rideshare work as his only viable path to income. No ability-to-pay hearing was conducted in response to this notice.

46. In July 2023, Defendants suspended Plaintiff's Colorado driver's license for child support nonpayment. Plaintiff discovered the suspension through a background check when attempting to register as a rideshare driver. No ability-to-pay hearing was conducted before the suspension issued. Plaintiff could not begin rideshare work until September 2023.

47. On July 5, 2023, the obligee emailed SD DSS Adoption Program Specialist Hannah Holen stating there had been "a temporary change in plans" and that E.H. "will be with me for a while." On July 12, 2023, the obligee stated to Holen: "She hasn't gone to Jerry's yet. She's been in treatment and was supposed to move in with him at the end of this month, but she will be with me instead." E.H. was discharged to the obligee on July 31, 2023, rather than to Plaintiff as previously planned.

48. In November 2022, Plaintiff received a license suspension notice while the State was garnishing his unemployment benefits but had not yet disbursed the corresponding support payments, owing to an approximately twelve-week COVID-related administrative backlog. The State thus created the appearance of nonpayment through its own disbursement delay while threatening suspension for that nonpayment. Payments were received before the threatened suspension was triggered. No ability-to-pay hearing was offered in connection with the notice.

49. Plaintiff's Colorado driver's license was suspended for child support nonpayment in July 2018, July 2023, February 2025, and April 2026. As Defendant Brant's February 5, 2025 written statement confirms, these enforcement remedies were applied as a matter of agency policy. Of these suspensions, only the February 2025 suspension occurred while an active wage garnishment was already in place that guaranteed payment. No ability-to-pay hearing preceded any of these suspensions. As to the April 2026 suspension, no ability-to-pay hearing was held, and Plaintiff was unable to contact agency officials to address it because defense counsel had already entered an appearance on the docket. The Rules of Civil Procedure barred Plaintiff from contacting the represented agency to remedy the suspension; yet Defendant Lucero contacted Plaintiff directly, despite counsel's instruction that all communication go through him. Plaintiff's unsuccessful Temporary Restraining Order application was his only available recourse to attempt to prevent this action, and Plaintiff is now left with no viable path to have his license reinstated.

***G. Formal Notice, Retaliation, and Ratification (Exhibits 16, 17, 18, 19, 21)***

50. On October 10, 2025, Plaintiff provided formal written notice to all named Defendants identifying: (1) the absence of a valid judicial predicate for the enforcement; (2) Plaintiff's severe financial hardship and imminent homelessness; and (3) the direct causal connection

between the enforcement and Plaintiff's housing crisis. This notice placed all Defendants on actual knowledge of the circumstances alleged herein.

51. On November 12, 2025, Plaintiff filed a motion in Larimer County District Court requesting that the court identify the prevailing order. On November 13, 2025 — one day later — Defendant Lucero issued a manual payment demand against Plaintiff. No independent factual basis for the November 13 demand, beyond the timing of the filing, has been identified in the record.

52. On December 2, 2025, Defendant Johnston responded to Plaintiff's written description of suicidal ideation, enforcement-caused pending homelessness, and psychological distress with the following: "If you are feeling overwhelmed and suicidal please reach out and call 988. Here's a link for resources. Take care. Carleen." The enforcement continued without pause, audit, or referral to legal review after Johnston's response.

53. On February 5, 2026, Defendant O'Hayre issued a formal written response identifying the Separation Agreement as the enforcement predicate, characterizing the June 10, 2015 ICON output as "simply the notation of the court clerk regarding a purely administrative function," and stating the agency had "acted appropriately." No enforcement action was stayed and no audit was initiated.

54. On March 17, 2026, the U.S. Marshals executed service of the federal summonses upon Defendants in this civil rights action. On March 18, 2026 — one day later — Defendant Lucero authorized a license suspension notice against Plaintiff. No new factual predicate for the March 18 suspension, beyond the timing of federal service, has been identified in the record. This suspension issued despite O'Hayre's confirmation, in her February 5, 2026 written response, that there were no license suspensions then pending.

55. On March 24, 2026, the Larimer County Board of County Commissioners convened in regular session. Deputy County Attorney David Ayraud briefed the Board, characterizing the dispute as concerning "a child support order… and his disagreement with the enforcement action being taken." Commissioner Kefalas made the motion to defend and indemnify all named defendants. The motion carried 2-0. The Board was not informed that the ICON register contains no child support order at any point in the history of the case, that Director O'Hayre had identified the Separation Agreement as the enforcement predicate, or that the suspension policy operated without Turner-compliant hearings.

56. In December 2025, Plaintiff filed a complaint with the Colorado Child Protection Ombudsman. Case Analyst Kourtney Anne Fitzpatrick opened the case. In May 2026, the CPO closed the case due to capacity constraints, stating: "You deserve timely support and we recognize this falls short of that expectation."

***H. Municipal Customs and Ratification***

57. Larimer County maintained the following enforcement customs with deliberate indifference to their constitutional consequences: (1) Enforcement Without Order Verification — initiating and sustaining collection without confirming the existence of a valid judicial order, reflected in FSR garnishment activity commencing in 2018 in the absence of any pre-2022 ICON order entry; (2) Automatic License Suspension Without Turner Hearings — suspending driver's licenses for child support nonpayment without providing notice that ability to pay is a critical issue or a meaningful opportunity to be heard, reflected in the July 2018, July 2023, February 2025, and April 2026 suspensions and the November 2022 and March 2026 suspension notices; (3) Application of Incorrect Worksheets Regardless of Actual Custody — applying Worksheet A

without verifying actual overnight custody arrangements, reflected in Jashinsky's July 7, 2022 written statement; (4) Failure to Investigate After Formal Notice — continuing enforcement without review after receiving formal written notice in October 2025 identifying the absence of a valid predicate order. Each of the foregoing customs was formally ratified by Director O'Hayre's February 5, 2026 written response and by the Board of County Commissioners' 2-0 vote on March 24, 2026.

58. Director O'Hayre, as final policymaker for LCDHS, ratified the enforcement customs in writing on February 5, 2026, after receiving explicit notice of the circumstances alleged herein. A final policymaker who receives explicit notice of an enforcement custom's application and responds by reaffirming that custom has made the custom the official policy of the municipality. Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986).

## V. CLAIMS FOR RELIEF

### COUNT I — PROCEDURAL DUE PROCESS: License Suspensions Without Ability-to-Pay Hearings

Fourteenth Amendment / 42 U.S.C. § 1983

Against Defendants Johnston, Brant, Lucero, O'Hayre, and Larimer County

***The Constitutional Question***

59. A driver's license is a protected liberty interest. Bell v. Burson, 402 U.S. 535, 539 (1971). Before the State may suspend a license for child support nonpayment, due process requires: (1) notice that ability to pay is a critical issue; and (2) a meaningful opportunity to be heard. Turner v. Rogers, 564 U.S. 431, 448 (2011). These protections are constitutionally mandatory before a liberty interest may be suspended based on nonpayment.

***What Defendants Have Already Conceded***

60. Defendant Brant stated in writing on February 5, 2025 that Plaintiff had been given misinformation for over three years and that: "Any enforcement remedies Colorado takes is based on our policy and procedures, the obligee's nor the other states are able to have any input or make agreements regarding actions our office takes." This statement reflects that license suspensions were executed as a matter of administrative policy rather than individualized review, and that the obligee's November 1, 2022 written waiver of arrears was not a factor in the enforcement decision, nor was the private agreement O'Hayre later identified as the operative instrument.

61. On each of the four suspension occasions identified in the Statement of Facts (¶¶ 46, 48, 49, 54): no notice was provided to Plaintiff that his ability to pay was a critical issue, and no opportunity to be heard was provided before the suspension issued.

***What the Record Reflects***

62. Brant's written statement reflects a policy of automatic license suspension without individualized ability-to-pay review. Applied to Plaintiff, that policy operated without the notice and hearing Turner requires on four discrete occasions. Turner v. Rogers was clearly established law years before the first suspension at issue. Hope v. Pelzer, 536 U.S. 730, 741 (2002). Qualified immunity is not available to the individual Defendants on this Count.

63. The July 2023 suspension issued after Plaintiff's May 2023 written notice of financial hardship and blocked Plaintiff's ability to begin rideshare work. The South Dakota DSS correspondence at ¶ 47 reflects the connection between Plaintiff's subsequent housing loss and E.H.'s redirection to the obligee.

64. Director O'Hayre's February 5, 2026 written response reaffirming the enforcement, after receiving Plaintiff's October 10, 2025 formal notice, supports Monell liability. Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986).

***The Claim***

65. Plaintiff incorporates by reference ¶¶ 45-49 (suspension events and financial-hardship notice), ¶¶ 50, 52-53 (formal notice and Johnston/O'Hayre responses), and ¶¶ 57-58 (Custom 2 and ratification).

66. Defendants deprived Plaintiff of his liberty interest in his driver's license on multiple occasions without Turner-compliant notice and hearing — including July 2018, July 2023, February 2025, and April 2026 — pursuant to the administrative custom described at ¶ 57(2). On each occasion, no notice that ability to pay was a critical issue and no opportunity to be heard preceded the suspension.

67. As a direct and proximate result: Plaintiff lost his livelihood; lost E.H.'s planned placement with him; suffered two periods of homelessness totaling approximately seventeen months, from June 2023 through November 15, 2024 and from January 29, 2026 through May 29, 2026; and suffered economic damages in an amount to be determined at trial. Punitive damages are warranted against Johnston, Brant, Lucero, and O'Hayre in their individual capacities. Smith v. Wade, 461 U.S. 30 (1983). Larimer County is liable under Monell, 436 U.S. 658 (1978).

**COUNT II — PROCEDURAL DUE PROCESS: Enforcement Without Judicial Predicate**

Fourteenth Amendment / 42 U.S.C. § 1983

Against All Individual-Capacity Defendants and Larimer County

***The Constitutional Question***

68. The Fourteenth Amendment prohibits the State from depriving any person of property without due process of law. Fuentes v. Shevin, 407 U.S. 67, 80 (1972). Executive enforcement of a financial obligation without a valid underlying judicial order deprives the obligor of property without the process due.

***What Defendants Have Already Conceded***

69. The ICON Register of Actions for Case No. 2015DR000229 contains no child support order entry predating June 2, 2022, and the June 2, 2022 entry carries the "Child Support Order-1st" classification label. See ¶¶ 23, 36.

70. The Larimer County Records Department produced no 2015 child support order after a 34-day search. See ¶ 40.

71. Event ID 000031, entered June 2, 2022, carries "N/A" in the Authorizer field and lists $0.00 in arrears at a time when the FSR ledger reflected $6,638.00 outstanding. See ¶¶ 37-38.

72. Director O'Hayre identified the Separation Agreement — the document whose blank SSN fields correspond to the June 10, 2015 ICON rejection output — as the enforcement predicate. See ¶¶ 24, 53.

73. The Board of County Commissioners voted 2-0 to defend and indemnify the named defendants after being informed the dispute concerned "a child support order" without being informed that no valid order ever appears in the official record. See ¶ 55.

***What the Record Reflects***

74. The record reflects: (a) the June 9, 2015 minute order conditioned entry of the support orders on provision of the children's Social Security Numbers, and the June 10, 2015 system entry documents that the condition was not met and the orders were therefore never entered; (b) no

executable child support order in Case No. 2015DR000229 ever existed; (c) enforcement was nonetheless conducted using the Separation Agreement as the operative instrument rather than a valid court order, as O'Hayre stated in writing; (d) the June 2, 2022 ICON entry carries an "N/A" Authorizer field and a $0.00 arrearage figure, supporting the inference of an administrative data entry rather than a judicially authorized order; and (e) the enforcement was formally ratified at both the agency and legislative levels after notice. Because the support orders never ripened into entered orders, there was no order to modify; under Colorado's void-modification doctrine, the June 2, 2022 entry cannot retroactively authorize the preceding seven years of enforcement. People v. District Court, 713 P.2d 918, 921 (Colo. 1986). Colorado law confirms that a child support enforcement authority must satisfy the mandatory statutory prerequisites before any enforceable support obligation arises; an enforcement apparatus that proceeds without that predicate acts without lawful authority. Adams Cnty. Dep't of Soc. Servs. Child Support Enforcement Unit v. Huynh, 883 P.2d 573, 574 (Colo. App. 1994). Plaintiff does not ask this Court to void any state-court order; he alleges only that the executive enforcement conduct lacked the valid predicate that Colorado law itself requires. Qualified immunity is not available, because a reasonable official would have known that enforcing a financial obligation absent an entered judicial order violates due process. Hope v. Pelzer, 536 U.S. 730, 741 (2002).

***The Claim***

75. Plaintiff incorporates by reference ¶¶ 22-40 (predicate-order facts), ¶¶ 53, 55 (O'Hayre and BCC ratification), and ¶¶ 57-58 (Custom 1 and ratification).

76. From June 10, 2015 through the filing of this action, Defendants initiated, executed, sustained, and ratified executive enforcement of child support against Plaintiff in the absence of

an executable judicial order in Case No. 2015DR000229, resulting in net seizures of $37,337.42 documented in the Family Support Registry and two periods of homelessness totaling approximately seventeen months. Larimer County is liable under Monell because this enforcement custom was the moving force behind the deprivations and was formally ratified at both the agency and legislative levels.

**COUNT III — SUBSTANTIVE DUE PROCESS: Prohibited Collection and Status Inversion**

Fourteenth Amendment / 42 U.S.C. § 1983

Against Defendants Jashinsky, Batts, Boyd, Rodig, O'Hayre, and Larimer County

***The Constitutional Question***

77. Conduct by executive officials that shocks the conscience violates the substantive component of the Fourteenth Amendment's Due Process Clause. County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). Collection of child support in direct conflict with 45 C.F.R. § 303.11(b)(12), while simultaneously designating the obligor as the custodial resource and interfering with a medically recommended placement with Plaintiff, is conduct the record supports characterizing as conscience-shocking.

***What Defendants Have Already Conceded***

78. 45 C.F.R. § 303.11(b)(12) prohibited collection of support from Plaintiff during the January 2022 through August 2023 residential placement period. During that period, Defendants collected $12,440 from Plaintiff. See ¶¶ 41-43.

79. Defendant Jashinsky stated in a July 7, 2022 written communication that he credited the obligee with overnights for a child in 24/7 residential treatment in another state because she

needed to "maintain her home to take care of the child when the child is released from the treatment facility." The obligee had no documented overnights. Jashinsky applied Worksheet A. Defendant Batts stated in writing that the agency does not "get involved in any parenting time issues" during modification proceedings. See ¶ 44.

80. In April 2023, South Dakota designated Plaintiff as E.H.'s adoption subsidy payee while Colorado continued to classify Plaintiff as the non-custodial obligor. See ¶¶ 42-43.

***What the Record Reflects***

81. The record reflects collection of $12,440 in direct conflict with 45 C.F.R. § 303.11(b)(12), application of Worksheet A based on undocumented overnights, and simultaneous classification of Plaintiff as custodial payee (South Dakota) and non-custodial obligor (Colorado). The $12,440 collection during the prohibited period, combined with the incorrect worksheet application, supports the inference of deliberate indifference to Plaintiff's constitutional rights. County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).

***The Claim***

82. Plaintiff incorporates by reference ¶¶ 41-44 (residential placement, $12,440 seizure, South Dakota designation, and worksheet admission) and ¶¶ 57-58 (Custom 3 and ratification).

83. Defendants collected $12,440 in direct conflict with 45 C.F.R. § 303.11(b)(12), applied an incorrect custody classification based on undocumented overnights, and maintained contradictory custodial designations across state lines. Qualified immunity is not available. Hope v. Pelzer, 536 U.S. 730, 741 (2002). This conduct contributed to the housing loss documented at ¶¶ 45-47 and to E.H.'s inability to come to Colorado.

**COUNT IV — SUBSTANTIVE DUE PROCESS: Deliberate Indifference After Formal Notice**

Fourteenth Amendment / 42 U.S.C. § 1983

Against Defendants Johnston, O'Hayre, and Larimer County

***The Constitutional Question***

84. Whether state officials demonstrate deliberate indifference rising to conscience-shocking conduct when, upon receiving formal written notice that their agency's enforcement is causing documented constitutional harm, they continue that enforcement without review, audit, or process. County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).

***What Defendants Have Already Conceded***

85. On December 2, 2025, Defendant Johnston responded to Plaintiff's written description of enforcement-caused homelessness and psychological distress with the following: "If you are feeling overwhelmed and suicidal please reach out and call 988. Here's a link for resources. Take care. Carleen." The enforcement continued without pause, audit, or referral to legal review. See ¶ 52.

86. On February 5, 2026, Director O'Hayre responded to the same formal notice chain by identifying the Separation Agreement as the enforcement predicate and stating the agency had "acted appropriately." No enforcement action was stayed. See ¶ 53.

***What the Record Reflects***

87. Johnston received notice of enforcement-caused psychological distress and housing crisis and responded without pausing the enforcement or initiating an ability-to-pay review. O'Hayre received the same notice chain, as well as an official complaint submitted to the County's Human

Resources department, and responded by reaffirming the enforcement. The record supports the inference that each official received actual notice of the circumstances alleged and took no remedial action. Lewis, 523 U.S. at 846.

***The Claim***

88. Plaintiff incorporates by reference ¶¶ 50, 52-53 (notice, Johnston 988 response, O'Hayre ratification) and ¶¶ 57-58 (Custom 4 and ratification). Defendants Johnston and O'Hayre received formal notice of enforcement-caused harm and continued the enforcement without process. Qualified immunity is not available. Hope v. Pelzer, 536 U.S. 730, 741 (2002). Larimer County is liable under Monell.

**COUNT V — FIRST AMENDMENT RETALIATION: Petitioning Activity**

First Amendment / 42 U.S.C. § 1983

Against Defendant Lucero and Larimer County

***The Constitutional Question***

89. The First Amendment protects the right to petition the government for redress of grievances. State officials may not impose adverse enforcement actions in response to a citizen's exercise of that right.

***What Defendants Have Already Conceded***

90. On November 12, 2025, Plaintiff filed a state court motion requesting that the court identify the prevailing order. On November 13, 2025 — one day later — Defendant Lucero issued a manual payment demand. No independent factual basis for the November 13 demand, beyond the timing of the filing, has been identified in the record. See ¶ 51.

91. On March 17, 2026, the U.S. Marshals executed federal service. On March 18, 2026 — one day later — Defendant Lucero authorized a license suspension notice. No new factual predicate for the March 18 suspension, beyond the timing of federal service, has been identified in the record. See ¶ 54.

***What the Record Reflects***

92. The temporal proximity of one day between each protected petitioning act and each adverse enforcement action, combined with the absence of an independent factual basis for either enforcement action, supports the inference of retaliatory causation on both occasions.

***The Claim***

93. Plaintiff incorporates by reference ¶¶ 51, 54 (petitioning activity and next-day adverse actions) and ¶¶ 57-58 (Custom 5 and ratification). Defendant Lucero issued adverse enforcement actions on November 13, 2025 and March 18, 2026, each one day after a discrete act of constitutionally protected petitioning activity, without an independent factual basis. Qualified immunity is not available. Hope v. Pelzer, 536 U.S. 730, 741 (2002); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Larimer County is liable under Monell.

**COUNT VI — PROCEDURAL DUE PROCESS: Modification Timeliness**

Fourteenth Amendment / 42 U.S.C. § 1983

Against Defendants Jashinsky, Brant, Johnston, O'Hayre, and Larimer County

***The Constitutional Question***

94. A modification procedure raises a procedural due process claim where it both (a) structurally excludes actual custody data from the calculation, and (b) takes so long to complete — here, long enough that the agency conceded it might not finish before the youngest child's emancipation —

that the obligor is forced to pay an admittedly erroneous amount in full throughout the delay, with no interim relief. Mathews v. Eldridge, 424 U.S. 319, 335 (1976). The extended duration of the modification process, combined with the agency's own administrative errors and inability to verify readily available information, deprived Plaintiff of a timely and accurate determination.

***What Defendants Have Already Conceded***

95. Director O'Hayre stated in her February 5, 2026 letter that the 2022 modified order was entered to "reflect the emancipation of your oldest child." The modification did not adjust for E.H.'s residential placement or R.H.'s documented periods of residence with Plaintiff.

96. Defendant Jashinsky stated in writing on July 7, 2022 that he credited the obligee with overnights for a child in residential treatment. Defendant Batts stated the agency does not "get involved in any parenting time issues" during modification proceedings. See ¶ 44.

***What the Record Reflects***

97. Under Mathews v. Eldridge: the private interest is substantial — years of support calculations based on undocumented custody assumptions; the risk of erroneous deprivation is reflected in the agency's own written statements excluding actual custody data from the modification process and in the extended time the agency took to complete a modification it conceded might not finish before emancipation; and the government's interest in maintaining calculations inconsistent with documented custody facts is limited. Plaintiff signed the modification under financial circumstances that did not permit further delay: simultaneous license suspension, housing loss, E.H.'s placement change, and South Dakota collection actions. Plaintiff continued paying support for two months past R.H.'s 19th birthday, and provided employment verification for the

obligee after the agency claimed it could not verify her employment during the modification process.

***The Claim***

98. Plaintiff incorporates by reference ¶ 44 (worksheet and custody admissions) and ¶¶ 45-49 (financial circumstances during modification period). Defendants applied a modification procedure that structurally excluded actual custody data and took an unreasonable time to complete while enforcing the unmodified amount in full. Qualified immunity is not available. Hope v. Pelzer, 536 U.S. 730, 741 (2002). Larimer County is liable under Monell because the modification policy excluding parenting time was the agency's official custom.

**COUNT VII — FAIR CREDIT REPORTING ACT: Willful Violations**

15 U.S.C. § 1681n and § 1681s-2

Against Defendants Johnston, Brant, Jashinsky, Lucero, Batts (Colorado Furnishers); Boyd, Rodig (South Dakota Furnishers); O'Hayre, Barnes, Althoff (Official Capacity); and Larimer County

***The Statutory Framework***

99. A private right of action exists under 15 U.S.C. § 1681n and § 1681o for willful or negligent violations of 15 U.S.C. § 1681s-2(b). Section 1681s-2(b) imposes duties on a furnisher after it receives notice of a consumer dispute from a Consumer Reporting Agency (CRA): to conduct a reasonable investigation, review all relevant information provided by the CRA, and correct or delete inaccurate or unverifiable information. No private right of action exists under § 1681s-2(a); that subsection is not the basis for any claim in this Count. Liability for willful

noncompliance, including reckless disregard of these duties, arises under § 1681n. Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 57 (2007).

100. Plaintiff incorporates by reference ¶¶ 27-31 (tradeline dates, dispute dates, bureau responses, re-aging events, and continuing derogatory reporting).

***Furnisher Identification and State-Action Bridge***

101. The disputed tradelines were furnished by two governmental child support enforcement entities: the South Dakota Division of Child Support and the Colorado child support enforcement program. Defendant Spicciati, in his October 20, 2025 state-court filing captioned "The People of the State of Colorado, through Arthur J. Spicciati, Assistant Larimer County Attorney," stated that the local child support division "represents the State of Colorado." Larimer County, by the sworn representation of its own County Attorney, acts as the operational arm of the State of Colorado child support enforcement program that furnishes the disputed information. Larimer County may not simultaneously represent that it acts for the State to establish its enforcement authority while disclaiming furnisher status to avoid FCRA liability for the data its enforcement decisions generate.

***The Factual Reporting Errors Subject to Investigation***

102. The disputed tradelines contain factual reporting errors that are objectively and readily verifiable from the record, distinct from any legal conclusion about contract validity: (a) Date Discrepancy — the Colorado tradeline reflects a "Date Opened" of June 9, 2015, one day before the June 10, 2015 ICON output identifying the missing statutory prerequisite; (b) Missing Predicate Order — the tradelines report a debt while the Register of Actions contains no child support order entry predating June 2, 2022; (c) Internal Delinquency-Date Anomaly — the

Equifax tradeline reports a "Date Opened" of June 9, 2015 but a "Date of First Delinquency" of June 30, 2025, a configuration facially inconsistent with a continuously derogatory ten-year-old account and consistent with re-aging; and (d) Truncated Review Window — the Equifax tradeline reports "Months Reviewed: 44," a window extending back only to approximately November 2021 rather than to the reported 2015 origin date, with the "Date of Last Activity" field left blank. Each is verifiable by comparing the reported tradeline fields against the court record and against the tradeline's own internal fields.

***Violation Event 1: Failure to Investigate After November 2022 Dispute — SD Division of Child Support (Experian)***

103. On or about November 2022, Plaintiff disputed the South Dakota Division of Child Support tradeline through Experian. Bureau: Experian. Furnisher: South Dakota Division of Child Support (Account 326684XXXXXX). Experian conducted a reinvestigation, contacted the furnisher, supplied the furnisher the dispute information, and instructed the furnisher to verify accuracy. On November 18, 2022, Experian issued dispute results (Report Number 4125-0074-23) reflecting that the furnisher certified the information as accurate and that the item "Remains" unchanged. The furnisher certified accuracy without correcting the verifiable reporting errors identified in ¶ 102. Alleged violation: 15 U.S.C. § 1681s-2(b); § 1681n.

***Violation Event 2: Failure to Investigate After April 2025 Dispute — CO Division of Child Support (Experian)***

104. On or about April 2025, Plaintiff disputed the Colorado Division of Child Support tradeline through Experian. Bureau: Experian. Furnisher: Colorado Division of Child Support (Account 143520XXXXXX). Experian conducted a reinvestigation, contacted the furnisher, supplied the

furnisher the dispute information, and instructed the furnisher to verify accuracy. On April 7, 2025, Experian issued dispute results (Report Number 0414-6940-52) reflecting that the furnisher certified the information as accurate and that the item "Remains" unchanged. The furnisher certified accuracy without correcting the verifiable reporting errors identified in ¶ 102. This is the second occasion on which a child support furnisher certified the same category of verifiable error as accurate following a CRA-transmitted dispute. Alleged violation: 15 U.S.C. § 1681s-2(b); § 1681n.

***Violation Event 3: South Dakota Re-Aging — February 2021 (TransUnion)***

105. On or about February 2021, Defendants Boyd and Rodig furnished a new child support account entry to TransUnion reflecting an account origin date years after the original 2015 reporting. Bureau: TransUnion. Furnishers: Boyd and Rodig. The change in reported account origin date constitutes re-aging that extends the period of adverse credit impact beyond what the original reporting date would support. Alleged violation: 15 U.S.C. § 1681s-2(b); § 1681n.

***Violation Event 4: South Dakota Re-Aging — September 2021 (TransUnion)***

106. On or about September 2021, Defendants Boyd and Rodig furnished a second new account entry to TransUnion reflecting a further change in the reported account origin date. Bureau: TransUnion. Furnishers: Boyd and Rodig. This second re-aging event constitutes a separate discrete violation extending the adverse credit impact period. Alleged violation: 15 U.S.C. § 1681s-2(b); § 1681n.

***Violation Event 5: Continuing Derogatory Reporting After Notice (Equifax)***

107. A child support tradeline furnished by the Colorado child support enforcement program remained active on Plaintiff's Equifax credit report after the filing of this action and after

Plaintiff's October 10, 2025 formal written notice to all Defendants. Bureau: Equifax. The tradeline reflected a "Date Opened" of June 9, 2015, an outstanding balance exceeding $15,000, a "Date of First Delinquency" of June 30, 2025, and "Months Reviewed: 44." Continued reporting of a tradeline carrying these internally inconsistent date fields, after formal written notice of the verifiable errors identified in ¶ 102, reflects reckless disregard of the furnisher's ongoing § 1681s-2(b) duties. Alleged violation: 15 U.S.C. § 1681s-2(b); § 1681n.

***The Claim***

108. Each violation event identified in ¶¶ 103-107 constitutes a discrete actionable violation under § 1681s-2(b). On two separate occasions — November 18, 2022 (SD Division of Child Support) and April 7, 2025 (CO Division of Child Support) — a child support furnisher received a CRA-transmitted dispute and certified the information as accurate ("Remains") without correcting the objectively verifiable reporting errors identified in ¶ 102. The re-aging events and the post-notice continuing reporting constitute additional discrete violations. This conduct reflects reckless disregard of statutory investigation duties within the meaning of Safeco, 551 U.S. at 57. The false reporting suppressed Plaintiff's FICO score to 461, eliminated his ability to secure stable housing, and contributed to two periods of homelessness totaling approximately seventeen months. Plaintiff seeks statutory damages for each discrete violation event, actual damages, punitive damages, and permanent injunctive relief compelling deletion of all affected tradelines. 15 U.S.C. § 1681n; § 1681o.

**COUNT VIII — MONELL LIABILITY: Unconstitutional Customs and Official Ratification**

42 U.S.C. § 1983

Against Larimer County, Colorado

***The Constitutional Question***

109. A municipality is liable under § 1983 when an official policy or custom is the moving force behind a constitutional violation. Monell v. Dep't of Social Services, 436 U.S. 658 (1978). A final policymaker's ratification of unconstitutional conduct after notice constitutes official policy. Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986).

***What Defendants Have Already Conceded***

110. The following written statements by Larimer County officials establish the existence of enforcement customs: (1) Brant's February 5, 2025 statement that enforcement is based exclusively on "policy and procedures" — supporting Customs 1 and 2; (2) Batts's statement that the agency does not "get involved in any parenting time issues" — supporting Custom 3; (3) O'Hayre's February 5, 2026 written response reaffirming the enforcement — supporting final policymaker ratification of Customs 1, 2, and 4; and (4) the Board of County Commissioners' 2-0 vote on March 24, 2026 — supporting legislative ratification of all five customs.

***What the Record Reflects***

111. Each of the five customs identified at ¶ 57 is reflected in written statements by Larimer County officials and was formally ratified at the agency level by Director O'Hayre and at the legislative level by the Board of County Commissioners. Pembaur, 475 U.S. at 480.

***The Claim***

112. Plaintiff incorporates by reference ¶¶ 57-58 (five customs and ratification chain) and the specific paragraphs identified in Counts I-VI as supporting each custom.

113. Larimer County's five unconstitutional customs, formally ratified by final policymakers, were the direct moving force behind the constitutional violations, the $37,337.42 in unlawful seizures, and Plaintiff's two periods of homelessness totaling approximately seventeen months. Larimer County is directly liable for compensatory damages under Monell.

## VI. PRAYER FOR RELIEF

114. WHEREFORE, Plaintiff Gerald Paul Hershfeldt respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

### *A. Declaratory Relief*

115. A declaration pursuant to 28 U.S.C. § 2201 that Defendants' child support enforcement actions from June 2015 through the present were conducted without lawful judicial authority and in violation of the Fourteenth and First Amendments and the FCRA. Plaintiff does not ask this Court to declare any state-court order void ab initio or overturn any state-court judgment.

### *B. Prospective Injunctive Relief*

116. Permanent injunctive relief enjoining Defendants in their official capacities from executing further wage garnishments, tax intercepts, and driver's license suspensions in the absence of a valid judicial order entered in compliance with applicable procedural requirements.

117. An order compelling the immediate and permanent deletion of all child support tradelines furnished by Defendants to all consumer reporting agencies that reflect the circumstances alleged in Count VII.

### *C. Restitution*

118. An order of restitution in the amount of $37,337.42, representing the net funds seized from Plaintiff as documented in the Family Support Registry Complete Payment Record for Account

XXXXX17-01, including the $12,440 collected during January 2022 through August 2023 in conflict with 45 C.F.R. § 303.11(b)(12).

***D. Compensatory Damages***

119. Compensatory damages against all individual-capacity Defendants and Defendant Larimer County in an amount to be determined at trial for: destruction of economic capacity; loss of livelihood; loss of E.H.'s planned placement with Plaintiff; two periods of homelessness totaling approximately seventeen months (June 2023 through November 15, 2024, and January 29, 2026 through May 29, 2026); severe emotional distress; mental anguish; and loss of enjoyment of life.

***E. FCRA Statutory and Actual Damages***

120. Statutory damages pursuant to 15 U.S.C. § 1681n for each of the five discrete violation events identified in Count VII (¶¶ 103-107), and actual damages pursuant to 15 U.S.C. § 1681o, in amounts to be determined at trial.

***F. Punitive Damages***

121. Punitive damages against the individual-capacity Defendants in an amount to be determined by a jury, sufficient to punish and deter the deliberate indifference and knowing disregard of clearly established constitutional rights described herein. 42 U.S.C. § 1983; 15 U.S.C. § 1681n; Smith v. Wade, 461 U.S. 30 (1983).

***G. Attorney's Fees and Costs***

122. Reasonable costs of litigation and attorney's fees pursuant to 42 U.S.C. § 1988 and 15 U.S.C. § 1681n(a)(3), should Plaintiff retain counsel.

***H. Additional Relief***

123. Such other and further relief as this Court deems just, proper, and equitable.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all claims so triable.

**AI CERTIFICATION**

Pursuant to Judge Nina Y. Wang's Standing Order Regarding the Use of Generative Artificial Intelligence in Court Filings, the undersigned certifies that generative artificial intelligence was used to assist in drafting this filing. The undersigned further certifies that the filing was personally reviewed for accuracy and that all legal citations reference actual non-fictitious authority.

**VERIFICATION**

I, Gerald Paul Hershfeldt, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am the Plaintiff in the above-captioned matter; that I have read the foregoing Second Amended Complaint; and that the factual allegations contained herein are true and correct to the best of my personal knowledge and belief, except as to matters alleged on information and belief, which I also believe to be true.

Respectfully submitted this 18th day of June, 2026.

/s/ Gerald Paul Hershfeldt

**GERALD PAUL HERSHFELDT**

Pro Se Plaintiff

429 E. 14th Ave. #107

Denver, CO 80203

720-378-8474

jerry.hershfeldt@gmail.com