**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-00342-NYW-CYC

GERALD PAUL HERSHFELDT,

Plaintiff,

v.

CARLEEN JOHNSTON, individually and in her official capacity; JENNIFER BRANT, individually and in her official capacity; TIMOTHY J. JASHINSKY, individually and in his official capacity; CINDY LUCERO, individually and in her official capacity; WENDY BATTS, individually and in her official capacity; ARTHUR J. SPICCIATI, individually and in his official capacity; LARRY BOYD, individually and in his official capacity; JANE RODIG, individually and in her official capacity; HEATHER O'HAYRE, individually and in her official capacity; MICHELLE BARNES, in her official capacity; LAURIE GILL, in her individual capacity; MATT ALTHOFF, in his official capacity; LARIMER COUNTY, COLORADO; and DOE DEFENDANTS 1-10,

Defendants.

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

## I. PRELIMINARY STATEMENT

1. This is a civil rights action under 42 U.S.C. § 1983 and the Fair Credit Reporting Act, 15 U.S.C. § 1681, to remedy a decade of unconstitutional child support enforcement executed without a valid entered judicial predicate and the willful suppression of Plaintiff's creditworthiness.

2. The foundation of this suit is the state court's own official record. On June 9, 2015, the court adopted the parties' Separation Agreement and entered the Decree of Dissolution, but it did so on one express condition: that the parties provide the Social Security Numbers for the children. The next day, June 10, 2015, the court's own system documented that the condition was not met, outputting: "UNABLE TO ENTER SUPPORT ORDERS AS WE ARE MISSING SSN FOR CHILDREN." Plaintiff alleges that, because this condition was never satisfied, no executable child support order was ever entered, and that human actors nonetheless proceeded with enforcement. The constitutional violations alleged here arise from that administrative conduct, not from any state-court judgment.

3. Plaintiff does not ask this Court to declare any state-court order void ab initio, overturn any state-court judgment, or review the correctness of any state-court ruling. Plaintiff challenges executive and administrative enforcement conduct — property seizures and liberty deprivations executed without a lawful entered judicial predicate and without constitutionally adequate process. Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).

4. Plaintiff pleads two alternative theories under Federal Rule of Civil Procedure 8(d), which permits alternative and even inconsistent theories at this stage of litigation. First, Plaintiff alleges that the June 9-10, 2015 record did not result in a separately entered, executable child-support order containing the amount and enforcement terms later used by Defendants (the "No-Executable-Order Track"). Second, even if the Decree and incorporated Separation Agreement are treated as creating an enforceable support obligation, Defendants acted contrary to those instruments by disregarding the direct-payment directive, selecting between materially inconsistent obligation amounts, creating and enforcing an administrative arrears balance without an identified adjudication of that balance, and imposing coercive remedies without

constitutionally adequate procedures (the "Contrary-to-Instrument Track"). Neither theory asks this Court to reverse or modify a state-court judgment. Under either track, Defendants must identify which instrument authorized each particular act, and substantial portions of their conduct remain unexplained.

## II. JURISDICTION, VENUE, AND STANDING

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a)(3) and (4). Plaintiff's claims arise under 42 U.S.C. § 1983 and the FCRA, 15 U.S.C. § 1681. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events occurred in this District and the Colorado Defendants reside and perform their official duties here.

6. Plaintiff has standing under Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992). The following concrete, particularized injuries were directly caused by Defendants' conduct and are redressable by this Court: (a) unlawful seizure of $37,337.42 in net credited funds, documented in the Family Support Registry Complete Payment Record for Account XXXXX17-01; (b) unlawful seizure of $12,440 during the period January 2022 through August 2023, while Plaintiff's daughter E.H. was in 24/7 state-funded residential treatment, based on overnights credited to the obligee that she was not physically exercising and a worksheet Plaintiff alleges did not reflect the actual placement; (c) suspension of Plaintiff's Colorado driver's license on multiple occasions without constitutionally adequate notice or opportunity to be heard, including June 2018, July 2023, December 2024, and April 2026; (d) suppression of Plaintiff's FICO credit score to 461 through willful furnishing of false or unverifiable credit information; (e) two periods of homelessness totaling approximately seventeen months — June 2023 through November 15, 2024, and January 29, 2026 through May 29, 2026, the latter period ending upon Plaintiff's acceptance into the Denver Rapid Rehousing Program; (f) loss of his daughter E.H.'s planned

placement with him in July 2023, which Plaintiff alleges was caused or materially contributed to by the financial depletion and housing loss resulting from Defendants' conduct; and (g) severe emotional distress, mental anguish, and loss of enjoyment of life.

7. Defendant Larimer County is a municipal entity not entitled to Eleventh Amendment sovereign immunity. Monell v. Dep't of Social Services, 436 U.S. 658 (1978). Defendant Spicciati's October 20, 2025 state-court filing — captioned "The People of the State of Colorado, through Arthur J. Spicciati, Assistant Larimer County Attorney" — and his statement that the local child support division "represents the State of Colorado" supports state action for § 1983 purposes and reflects Larimer County's operational role in the enforcement program, without transforming the County into an arm of the State for Eleventh Amendment purposes.

## III. PARTIES

8. Plaintiff Gerald Paul Hershfeldt is a resident of Denver County, Colorado, proceeding pro se.

9. Defendant Carleen Johnston is the Child Support Manager for Larimer County Department of Human Services (LCDHS), sued individually and in her official capacity. On December 2, 2025, Johnston responded to Plaintiff's written notice of enforcement-caused homelessness and psychological distress by directing him to the 988 Suicide and Crisis Lifeline. Plaintiff alleges that this response establishes Johnston's actual knowledge of the reported harm, and that she did not thereafter pause the enforcement, initiate an ability-to-pay review, or refer the matter for legal review.

10. Defendant Jennifer Brant is a Senior Child Support Specialist and Supervisor for LCDHS, sued individually and in her official capacity. On February 5, 2025, Brant stated in

writing: "Any enforcement remedies Colorado takes is based on our policy and procedures, the obligee's nor the other states are able to have any input or make agreements regarding actions our office takes." Plaintiff alleges this statement reflects that enforcement remedies were governed by agency policy rather than individualized agreement or obligee input, and that an active wage garnishment was already in place that guaranteed payment at the time enforcement remedies were pursued.

11. Defendant Timothy J. Jashinsky is a Lead Child Support Technician for LCDHS, sued individually and in his official capacity. On July 7, 2022, Jashinsky stated in a written internal communication that he credited the obligee with overnights for a child in 24/7 residential treatment because she needed to "maintain her home to take care of the child when the child is released from the treatment facility."

12. Defendant Cindy Lucero is a Child Support Specialist II for LCDHS, sued individually and in her official capacity. On November 13, 2025, Lucero issued a manual payment demand one day after Plaintiff filed a protected state court motion. On March 18, 2026, Lucero authorized a license suspension notice one day after U.S. Marshals executed federal service in this action. The present record identifies no intervening change in arrears, payment status, or other circumstance explaining the timing of either action.

13. Defendant Wendy Batts is a Child Support Technician II for LCDHS, sued individually and in her official capacity. Batts forwarded to Plaintiff the July 7, 2022 internal communication concerning the worksheet calculation and stated in writing that the agency does not "get involved in any parenting time issues" during modification proceedings. The identity of

the individual who entered the June 2, 2022 ICON register entry (Event ID 000031) is not established in the present record and is among the matters subject to discovery.

14. Defendant Arthur J. Spicciati is an Assistant County Attorney for Larimer County, sued individually and in his official capacity. On October 20, 2025, Spicciati filed a state-court response captioned "The People of the State of Colorado," confirming state action for § 1983 purposes.

15. Defendant Larry Boyd is a Supervisor for the South Dakota Division of Child Support, sued individually and in his official capacity. On June 4, 2025, Boyd stated in writing that South Dakota shares employment information with Colorado "so they can enforce."

16. Defendant Jane Rodig is a Lead Child Support Specialist for the South Dakota Division of Child Support, sued individually and in her official capacity. On January 13, 2025, Rodig mailed Form DSS-SE-466A to Plaintiff's Colorado employer at 4704 Harlan Street, Suite 220, Denver, Colorado 80212, invoking SDCL 25-7A-56.5 to compel disclosure of Plaintiff's wages and employment status.

17. Defendant Heather O'Hayre is the Director of LCDHS, sued individually and in her official capacity. On information and belief, O'Hayre possessed final, unreviewed authority within LCDHS to review, approve, continue, and direct the challenged child-support enforcement practices. On February 5, 2026, O'Hayre issued a formal written response identifying the Separation Agreement as the enforcement predicate, characterizing the June 10, 2015 ICON output as "simply the notation of the court clerk regarding a purely administrative function," and concluding the agency had "acted appropriately." No higher County

administrative official is identified in the present record as having reversed or reviewed that determination.

18. Defendant Michelle Barnes is the Executive Director of the Colorado Department of Human Services, sued in her official capacity for prospective relief. Plaintiff submitted formal complaints to the Colorado Department of Human Services regarding the enforcement, including a written complaint filed November 14, 2025 and acknowledged by the Department on November 20, 2025, which were not resolved. As the official with authority over the statewide child support enforcement apparatus, Barnes is a proper defendant for prospective injunctive and declaratory relief under Ex parte Young, 209 U.S. 123 (1908).

19. Defendant Laurie Gill is the former Cabinet Secretary of the South Dakota Department of Social Services, sued in her individual capacity for compensatory and punitive damages for conduct undertaken during her tenure as final policymaker.

20. Defendant Matt Althoff is the current Cabinet Secretary of the South Dakota Department of Social Services, substituted in his official capacity pursuant to Fed. R. Civ. P. 25(d) solely for prospective injunctive and declaratory relief. This substitution does not affect the individual-capacity claims against Defendant Gill.

21. Defendant Larimer County, Colorado, is a municipal entity liable under Monell for enforcement customs and policies described in the Statement of Facts below, which Plaintiff alleges were the moving force behind his injuries and were the subject of institutional notice and continued adherence following that notice.

22. Doe Defendants 1-10 are currently unidentified actors who created or authorized the June 2, 2022 ICON register entry (Event ID 000031) styled "Child Support Order-1st," and are subject to substitution upon identification through discovery.

## IV. STATEMENT OF FACTS

### A. The Separation Agreement, the June 9-10, 2015 Conditional Sequence, and the Decree of Dissolution (Exhibits 1, 2, 3, 23)

23. On March 4, 2015, Plaintiff and his former spouse filed a Separation Agreement and Parenting Plan in Larimer County District Court Case No. 2015DR000229. Section 2.1 of the Separation Agreement contained blank Social Security Number fields for both minor children, reading "XXX-XX-____," while the same instrument recorded both parents' full Social Security Numbers at paragraph 1.4 — a contrast Plaintiff alleges confirms the omission was specific to the children. Section 2.5.1 directed that Plaintiff pay child support directly to the obligee. Section 2.5.5 provided that child support payments "will be made through an income assignment" requiring activation through the court. Plaintiff alleges that no income assignment was ever validly activated, because the June 10, 2015 ICON system event identified the missing statutory prerequisite that prevented entry of the support order through which an income assignment would issue.

24. The Decree of Dissolution of Marriage, filed June 10, 2015 and signed by Magistrate Linda K. Connors, incorporates the Separation Agreement and directs the parties to perform its provisions, including direct payment of support rather than payment through an income assignment. Exhibit 23. Plaintiff attaches the Decree in full to place the complete input record before this Court. Plaintiff does not contend the Decree is itself void; Plaintiff alleges that the

Decree's incorporation of the Separation Agreement did not supply an executable child-support order given the unmet condition documented the same day in the ICON register.

25. In plain terms: on June 9, 2015, the court approved the parties' Separation Agreement and granted the divorce, but it required one thing before child support orders could be entered — the parties had to provide the children's Social Security Numbers. The next day, the court's own system recorded that this had not happened, and that support orders therefore could not be entered. Plaintiff alleges that the June 9-10, 2015 sequence did not produce a separately entered, executable child-support order identifying the controlling amount, activating an income assignment, or supplying the specific enforcement terms later used by Defendants, and that Plaintiff followed the Separation Agreement and paid the obligee directly, consistent with the parties' agreement and the Decree. The official record reflects this sequence across four entries. The ICON Register of Actions for Case No. 2015DR000229 records a conditional sequence across two days. On June 9, 2015 (Event ID 000014), the court reviewed and adopted the Separation Agreement and entered the Decree, while simultaneously imposing a condition stated in the minute order itself: "PARTIES WILL PROVIDE SSN FOR ALL MEMBERS OF THE FAMILY." On June 10, 2015 (Event ID 000020), the court's own system documented that the condition was not met: "UNABLE TO ENTER SUPPORT ORDERS AS WE ARE MISSING SSN FOR CHILDREN; REQUESTED OF PARTIES IN COURT ON 6/9/15." Plaintiff alleges that the June 10 entry does not override or nullify the June 9 proceeding, but completes the record of it, documenting that the condition imposed on June 9 was never fulfilled and that the support orders therefore never ripened into entered, executable orders containing the amount and enforcement terms later used by Defendants. The full record sequence is: Event ID 000004 (Separation Agreement filed March 4, 2015); Event ID 000014 (the June 9 conditional minute

order); Event ID 000018 (the Decree of Dissolution filed June 10, 2015); and Event ID 000020 (the June 10 documentation that the support orders could not be entered).

26. Alternatively, if the incorporated Separation Agreement itself supplied an enforceable obligation, the Decree expressly directed direct payment to the obligee rather than payment through an income assignment, see ¶ 28, and the official record contains materially inconsistent monthly amounts of $1,028 and $1,128. Defendants have not identified the process by which one amount was selected, direct payments were credited or rejected, and the resulting arrears balance was adjudicated. This is the Contrary-to-Instrument Track described at ¶ 4.

27. In her February 5, 2026 written response, Director O'Hayre identified the enforcement predicate as "the Decree of Dissolution of Marriage which… incorporates the Separation Agreement and Parenting Plan filed on March 4, 2015 which addressed child support." The Separation Agreement she identified as the enforcement predicate is the same document whose blank SSN fields in Section 2.1 correspond to the ICON system's June 10, 2015 rejection output.

28. The June 9, 2015 minute order (ICON Event ID 000014) records a support figure of $1,028 per month. Section 2.5.1 of the Separation Agreement records $1,128 per month. This $100 per month variance between the court's own minute order and the underlying Agreement is documented across the minute order, the Agreement, and the county ledger. The court's adopted instruction — direct payment — governed Plaintiff's performance obligation.

29. Plaintiff complied with the direct-payment agreement, paying the obligee directly from July 2015 through early 2017. The Family Support Registry Complete Payment Record reflects an FSR transition date of December 27, 2017, and no payment entries before July 17,

2018, leaving the period July 2015 through mid-2018 without any FSR enforcement entry — consistent with the direct-payment arrangement and the absence of any activated income assignment, which the June 10, 2015 ICON rejection had prevented.

**B. Credit Reporting: June 9, 2015 Through Present (Exhibits 12, 13, 14, 15, 32)**

30. On June 9, 2015, a Colorado child support tradeline was furnished to Experian with a "Date Opened" of June 9, 2015 — one day before the ICON system output identifying the missing statutory prerequisite on June 10, 2015.

31. In August 2021, Plaintiff disputed the Colorado child support tradeline. Following that dispute, the furnisher certified the disputed information as accurate without correction.

32. In April 2025, Plaintiff submitted a second formal dispute. Experian Report Number 0414-6940-52 reflects that following the April 2025 dispute, the furnisher certified the information as accurate ("Remains") without correction.

33. On or about February 2021, Defendants Boyd and Rodig caused a new child support account entry to be furnished to TransUnion, reflecting an account origin date years after the original 2015 tradeline. On or about September 2021, a second new account entry was furnished to TransUnion reflecting a further change in the reported account origin date. These events are alleged as background facts bearing on damages and the reliability of the reporting; Plaintiff's discrete statutory claims under Count VI are limited to the CRA-transmitted disputes identified in that Count.

34. The February 7, 2026 Equifax credit report for Plaintiff reflects an outstanding balance of $15,049 and an "Amount Past Due" of $700.00 marked "OVER 120 DAYS PAST DUE," active after the filing of this federal action.

**C. Interstate Administrative Activity and Employer Inquiry (Exhibits 9, 10, 11)**

35. On June 10, 2015, the obligee relocated to South Dakota with the children. Section 2.2 of the Separation Agreement prohibited either parent from relocating in a manner that substantially changed the parties' geographic ties without either a written agreement between the parties or an order of the court; the record reflects neither preceding the relocation. The present record contains no evidence that a Colorado order was registered in South Dakota under UIFSA, 28 U.S.C. § 1738B.

36. On June 4, 2025, Defendant Boyd stated in writing: "if we gain any information, we share that with Colorado so they can enforce."

37. On January 13, 2025, Defendant Rodig mailed Form DSS-SE-466A to Plaintiff's Colorado employer at 4704 Harlan Street, Suite 220, Denver, Colorado 80212, invoking SDCL 25-7A-56.5 to compel disclosure of Plaintiff's wages and employment status. Calder v. Jones, 465 U.S. 783 (1984); Dudnikov v. Chalk & Vermilion Fine Arts, 514 F.3d 1063 (10th Cir. 2008).

38. On July 17, 2018, the Family Support Registry recorded its first garnishment extraction from Plaintiff's wages — nearly three years after the June 9, 2015 tradeline opening and, Plaintiff alleges, during a period when no executable child support order had been entered in Case No. 2015DR000229. Larimer County's own enforcement technician confirmed the pre-2022 enforcement timeline in writing: in a May 22, 2023 email (Re: CP MOD), Susan Martens

stated, "We have been enforcing your case since 9/2021" — nine months before the June 2, 2022 ICON entry that the register itself classifies as the "1st" child support order.

**D. The June 2, 2022 Modification Order and the Separate ICON Register Entry (Exhibits 2, 4, 24)**

39. A document styled "Order Modifying Child Support," bearing a judicial signature and dated June 2, 2022, appears in the state-court record. Exhibit 24. Plaintiff acknowledges the document's existence but does not concede that it was procured through truthful and complete information, entered through constitutionally adequate procedures, or capable of curing prior unauthorized enforcement. The ICON register also contains a separate, same-day entry styled "Child Support Order-1st" (Event ID 000031), carrying an ordered amount of $622.00, a commence date of June 5, 2022, and an arrearage amount listed as $0.00. Plaintiff challenges the unexplained relationship between these two same-day records and alleges that neither could retroactively authorize enforcement conducted before June 2, 2022.

40. Paragraph 8 of the signed June 2, 2022 order expressly states that it addresses only current and medical support and "does not address past due support." It directs Plaintiff to contact Larimer County concerning payment arrangements on alleged past-due amounts but does not itself determine the amount, source, accuracy, or legal composition of those arrears. Plaintiff therefore alleges that the document cannot, by itself, establish the administrative balance later used for garnishments, license suspensions, credit furnishing, and other coercive enforcement.

41. Even if the June 2, 2022 document is treated as valid, it cannot retroactively authorize enforcement conducted before its entry, and it does not adjudicate the preexisting arrears balance enforced afterward. This is the Contrary-to-Instrument Track described at ¶ 4.

42. The identity of the individual who created Event ID 000031 is not established in the present record and is among the matters subject to discovery; Doe Defendants 1-10 include the actor or actors responsible. The metadata for Event ID 000031 reflects that the Filing ID, Authorizer, and Filing Party fields were listed as "N/A." No judicial officer is identified as the authorizing party for that entry specifically.

43. At the time Event ID 000031 was entered, the Family Support Registry ledger reflected $6,638.00 in outstanding arrears. Event ID 000031 listed the arrearage at issuance as $0.00. The record reflects an internal inconsistency between the ICON entry and the FSR ledger at the time of the entry.

44. The county ledger separately references an "ORDER DATED 06/09/2015." Plaintiff alleges that this reference corresponds to the June 9, 2015 minute order (ICON Event ID 000014), which the June 10, 2015 system output (Event ID 000020) reflects did not result in an entered support order. To the extent the June 2, 2022 modification order operated as a modification of a preceding order, Colorado's void-modification doctrine provides that a modification of an order never entered cannot supply a retroactive predicate for the preceding period. People v. District Court, 713 P.2d 918, 921 (Colo. 1986).

45. Plaintiff requested the original 2015 child support order from the Larimer County Combined Courts Records Department. After a 34-day search, the Records Department produced the June 2, 2022 Order Modifying Child Support. No 2015 order was produced. Exhibit 25.

**E. Residential Placement, Worksheet A, and the $12,440 Collection (Exhibits 6, 8)**

46. From January 2022 through August 2023, Plaintiff's minor daughter E.H. was placed in 24/7 state-funded residential treatment. In April 2023, South Dakota designated Plaintiff as

E.H.'s adoption subsidy payee, recognizing Plaintiff as the custodial resource in anticipation of E.H.'s discharge to his Colorado home. E.H.'s treatment team and Plaintiff had planned for E.H. to be discharged to Plaintiff's Colorado home at the end of July 2023.

47. During the residential placement period, Defendants continued to garnish Plaintiff's wages as a non-custodial obligor, collecting $12,440. In a July 7, 2022 internal communication forwarded to Plaintiff by Defendant Batts, Defendant Jashinsky stated that he credited the obligee with overnights for a child in 24/7 residential treatment in another state because she needed to "maintain her home to take care of the child when the child is released from the treatment facility." Plaintiff alleges the obligee had no documented overnights with E.H. at that time. Jashinsky applied Worksheet A (Sole Physical Care) to the modification calculation notwithstanding E.H.'s actual placement. Defendant Batts stated in writing that the agency does not "get involved in any parenting time issues" during modification proceedings.

48. Plaintiff alleges that Larimer County knew E.H. was in 24/7 residential treatment, credited the obligee with overnights she was not physically exercising, applied Worksheet A on that basis, and continued enforcing the resulting calculation and collecting from Plaintiff — while South Dakota simultaneously classified Plaintiff as the custodial resource for E.H. — without meaningful consideration of the actual placement data.

**F. License Suspensions, Financial Harm, and Loss of E.H.'s Placement (Exhibits 5, 20, 26)**

49. The $12,440 collected during E.H.'s residential placement period, described above, depleted Plaintiff's available financial resources during January 2022 through July 2023. In May 2023, Plaintiff sent formal written notice to LCDHS that he was out of unemployment funds, imminently facing homelessness, and needed his driver's license to begin rideshare work as his

only viable path to income. No hearing addressing his ability to pay or documented hardship was conducted in response to this notice.

50. In July 2023, Defendants suspended Plaintiff's Colorado driver's license for child support nonpayment. Plaintiff discovered the suspension through a background check when attempting to register as a rideshare driver. No hearing addressing ability to pay or the factual basis for suspension was conducted before the suspension issued. Plaintiff could not begin rideshare work until September 2023.

51. On July 5, 2023, the obligee emailed SD DSS Adoption Program Specialist Hannah Holen stating there had been "a temporary change in plans" and that E.H. "will be with me for a while." On July 12, 2023, the obligee stated to Holen that E.H. "hasn't gone to Jerry's yet," that E.H. "was supposed to move in with him at the end of this month, but she will be with me instead." E.H. was discharged to the obligee on July 31, 2023, rather than to Plaintiff as previously planned.

52. On November 18, 2022, Larimer County issued a Notice of Noncompliance and initiated driver's-license-suspension procedures while the State of Colorado was already withholding child-support funds from Plaintiff's unemployment benefits. Those funds had not yet posted to the child-support account because of an approximately twelve-week COVID-related administrative processing backlog, creating an apparent nonpayment in the enforcement system. Exhibit 29.

53. On November 29, 2022, Martens confirmed in writing that Plaintiff was "on the list for Driver license suspension," but stated that his unemployment "should kick in soon, so it will get you off the list." This statement demonstrates that Larimer County knew the threatened

suspension depended on delayed posting of funds already withheld by another arm of the State. The funds ultimately posted before suspension became effective. Suspension was avoided because the administrative transfer completed in time, not because a pre-deprivation review identified and corrected the State-created appearance of nonpayment. No hearing was offered in connection with the underlying notice. Exhibit 29.

54. Plaintiff's Colorado driver's license was suspended for child support nonpayment on four occasions, as reflected in the official Colorado driver record: effective June 20, 2018 (reinstated December 11, 2019); July 21, 2023 (reinstated August 29, 2023); December 23, 2024 (reinstated July 3, 2025); and April 20, 2026 (ongoing). Exhibit 26. As Defendant Brant's February 5, 2025 written statement confirms, these enforcement remedies were applied as a matter of agency policy. No hearing addressing ability to pay preceded any of these suspensions. As to the April 2026 suspension, no such hearing was held, and defense counsel had already entered an appearance on the docket by that time. Defendant Lucero nonetheless contacted Plaintiff directly regarding the suspension. Plaintiff's unsuccessful Temporary Restraining Order application was his only available recourse to attempt to prevent this action, and Plaintiff has no viable administrative path to have his license reinstated.

**G. Formal Notice, Retaliation, and Ratification (Exhibits 16, 17, 18, 19, 21, 27, 28, 30)**

55. On October 10, 2025, Plaintiff provided formal written notice to all named Defendants identifying: (1) the absence of a valid entered judicial predicate for the enforcement; (2) Plaintiff's severe financial hardship and imminent homelessness; and (3) the direct causal connection between the enforcement and Plaintiff's housing crisis. This notice placed all Defendants on actual knowledge of the circumstances alleged herein.

56. On November 12, 2025, Plaintiff filed a motion in Larimer County District Court requesting that the court identify the prevailing order. Exhibit 27. Later that day, Plaintiff directly transmitted the filed motion by email to Defendant Lucero and other agency officials. Exhibit 30. On November 13, 2025 — one day later — Defendant Lucero issued a manual payment demand against Plaintiff. The present record identifies no intervening change in arrears, payment status, or other circumstance explaining the timing of that demand.

57. On December 2, 2025, Defendant Johnston responded to Plaintiff's written description of suicidal ideation, enforcement-caused pending homelessness, and psychological distress with the following: "If you are feeling overwhelmed and suicidal please reach out and call 988. Here's a link for resources. Take care. Carleen." Plaintiff alleges that this response establishes Johnston's actual knowledge of the reported crisis. The enforcement continued without pause, audit, or referral to legal review after Johnston's response.

58. On February 5, 2026, Defendant O'Hayre issued a formal written response identifying the Separation Agreement as the enforcement predicate, characterizing the June 10, 2015 ICON output as "simply the notation of the court clerk regarding a purely administrative function," and stating the agency had "acted appropriately." No enforcement action was stayed and no audit was initiated.

59. On March 17, 2026, the U.S. Marshals executed service of the federal summonses upon Defendants in this civil rights action. Exhibit 28. On March 18, 2026 — one day later — Defendant Lucero authorized a license suspension notice against Plaintiff. The present record identifies no intervening change in arrears, payment status, or other circumstance explaining the

timing of that suspension. This suspension issued despite O'Hayre's confirmation, in her February 5, 2026 written response, that there were no license suspensions then pending.

60. On March 24, 2026, the Larimer County Board of County Commissioners convened in regular session. Deputy County Attorney David Ayraud briefed the Board, characterizing the dispute as concerning "a child support order… and his disagreement with the enforcement action being taken." Commissioner Kefalas made the motion to defend and indemnify all named defendants. The motion carried 2-0. Plaintiff alleges that this vote demonstrates institutional notice of this lawsuit and the enforcement dispute, and the County's decision to defend and indemnify the named employees. The Board was not informed that the ICON register contains no child support order entry predating June 2, 2022, that Director O'Hayre had identified the Separation Agreement as the enforcement predicate, or that license suspensions had proceeded without a hearing addressing ability to pay.

61. In December 2025, Plaintiff filed a complaint with the Colorado Child Protection Ombudsman. Case Analyst Kourtney Anne Fitzpatrick opened the case. In May 2026, the CPO closed the case due to capacity constraints, stating: "You deserve timely support and we recognize this falls short of that expectation."

**H. Defendants' Knowledge of the Record and Interstate Contradictions (Exhibit 31)**

62. The state-court Register of Actions reflects service of the 2015 court records upon Plaintiff. To the extent Defendants contend that Plaintiff was legally charged with knowledge of those records, the same records were maintained by, available to, or relied upon by the agencies exercising state enforcement power. Defendants cannot simultaneously attribute constructive knowledge of the record to Plaintiff while claiming that the officials responsible for establishing,

registering, modifying, calculating, and enforcing the obligation could reasonably proceed without reviewing the same record.

63. The record defects described above were available when South Dakota attempted to act upon the Colorado case, see ¶¶ 35-38; were directly implicated when Larimer County initiated the 2022 modification proceeding, see ¶¶ 39-45; were expressly raised by Plaintiff in 2025, see ¶ 55; and were formally reviewed by Director O'Hayre in February 2026, see ¶ 58. Whatever uncertainty may have existed earlier, Plaintiff alleges that continued enforcement after those later notice events was not based on an innocent lack of awareness.

64. Larimer County officials gave materially contradictory written descriptions of which government controlled the case. Martens stated, on or about February 3, 2025, that South Dakota was "in charge" of the case, made "all decisions" concerning what Plaintiff owed, and that Larimer County was "only here to collect money." Brant subsequently apologized, on February 5, 2025, for that "misinformation," stated that Colorado controlled the arrears and modification, required South Dakota to match Colorado's balance, and identified Larimer County's own "policy and procedures" as the basis for enforcement remedies. Johnston later stated, on or about July 11, 2025, that Larimer County was working the case for South Dakota and had to do what South Dakota requested.

65. These statements support a reasonable inference that no consistent verification or correction protocol governed the interstate balance. They also demonstrate Larimer County's direct discretion over enforcement remedies while officials alternately attributed responsibility for the underlying figures to the other state.

**I. Municipal Customs and Ratification**

66. Plaintiff alleges that Larimer County maintained the following enforcement customs with deliberate indifference to their constitutional consequences: (1) Enforcement Without Adequate Verification of the Predicate Record — initiating and sustaining collection without confirming the existence of a valid entered judicial order, reflected in FSR garnishment activity commencing in 2018 in the absence of any pre-2022 ICON order entry; (2) License-Suspension Procedures That Failed to Provide Adequate Individualized Process — suspending driver's licenses for child support nonpayment without a meaningful, individualized opportunity to contest the factual and legal grounds for suspension, reflected in the June 2018, July 2023, December 2024, and April 2026 suspensions and the November 2022 and March 2026 suspension notices; (3) Modification Procedures That Excluded or Replaced Actual Placement Data — applying Worksheet A without verifying actual overnight custody arrangements, reflected in Jashinsky's July 7, 2022 written statement and Batts's statement that the agency does not become involved in parenting-time issues; and (4) Failure to Investigate or Reconcile the Record After Formal Notice — continuing enforcement without review after receiving formal written notice in October 2025 identifying the absence of a valid entered predicate order.

67. Plaintiff alleges that Larimer County did not treat the challenged enforcement decisions as isolated employee mistakes. Defendant Brant expressly stated that Larimer County's enforcement remedies were governed by "our policy and procedures," supporting the existence of established County enforcement practices. Director O'Hayre then exercised, on information and belief, final and unreviewed County authority over Plaintiff's administrative challenge by reviewing agency records, consulting staff, construing the asserted enforcement predicate, and formally approving the challenged enforcement as appropriate on February 5, 2026. On March 24, 2026, the Board of County Commissioners received institutional notice of this federal action

and the enforcement dispute and voted to defend and indemnify the County defendants. Plaintiff alleges that these acts collectively demonstrate County policy, final approval by a County official with authority over the subject matter, institutional notice, and continued adherence to the challenged enforcement practices. Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). Plaintiff does not base municipal liability merely on the existence of Colorado's child-support statutes; state law supplied available enforcement mechanisms, but Plaintiff alleges that Larimer County's own policies, customs, discretionary selections, data practices, and final enforcement decisions were the moving force behind the constitutional injuries alleged. The interstate contradictions described at ¶¶ 64-65 further reflect Larimer County's independent enforcement discretion rather than passive compliance with another state's figures.

## V. CLAIMS FOR RELIEF

### COUNT I — PROCEDURAL DUE PROCESS: License Suspensions Without Constitutionally Adequate Process

### Fourteenth Amendment / 42 U.S.C. § 1983

### Against Defendants Johnston, Brant, Lucero, O'Hayre, and Larimer County

**The Constitutional Question**

68. A driver's license is a protected interest that may not be suspended without constitutionally adequate procedures. Bell v. Burson, 402 U.S. 535, 539 (1971). The process required depends upon the importance of the private interest, the risk of erroneous deprivation under the procedures used, the probable value of additional safeguards, and the governmental burden of providing them. Mathews v. Eldridge, 424 U.S. 319, 335 (1976). Although Turner v. Rogers, 564 U.S. 431 (2011), concerned civil contempt proceedings carrying a risk of incarceration and does not itself establish a categorical right to an ability-to-pay hearing before license suspension, it recognizes the constitutional importance of distinguishing inability to

comply from willful noncompliance in coercive child-support enforcement. Applying these principles to an automatic child-support license-suspension system, a New Jersey state trial court held that such a system violated procedural due process where it failed to provide adequate advance notice and a meaningful opportunity to contest suspension. Kavadas v. Martinez, No. MER-L-1004-15 (N.J. Super. Ct. Law Div. Dec. 7, 2018) (unpublished). Plaintiff cites Kavadas as persuasive, not controlling, authority, offered to show that applying Bell and Mathews to an automatic child-support license-suspension system is neither novel nor speculative.

**What Defendants' Records State**

69. Defendant Brant stated in writing on February 5, 2025 that Plaintiff had been given misinformation for over three years and that: "Any enforcement remedies Colorado takes is based on our policy and procedures, the obligee's nor the other states are able to have any input or make agreements regarding actions our office takes." Plaintiff alleges this statement reflects that license suspensions were executed as a matter of administrative policy rather than individualized review, and that the obligee's November 1, 2022 written waiver of arrears, Exhibit 29, was not a factor in the enforcement decision, nor was the private agreement O'Hayre later identified as the operative instrument.

70. Before the suspensions and suspension notices identified in ¶¶ 50, 52, 54, and 59, Plaintiff was not provided a meaningful opportunity to contest the factual and legal predicates for suspension, including the identity and terms of the asserted controlling order, the accuracy of the alleged arrears and payment records, the effect of existing withholding and administrative disbursement delays, and Plaintiff's documented inability to generate payment without the license necessary for employment.

**What the Record Reflects**

71. Larimer County's procedures treated the existence of agency-designated arrears as sufficient to initiate or impose suspension without meaningfully addressing the documented discrepancies in the predicate record, payment history, and enforcement status. Plaintiff alleges that those procedures created an unacceptably high risk of erroneous deprivation when weighed against the substantial importance of his license for employment, housing stability, and E.H.'s planned placement, while the burden of providing meaningful administrative review would have been limited. Hope v. Pelzer, 536 U.S. 730, 741 (2002).

72. The July 2023 suspension issued after Plaintiff's May 2023 written notice of financial hardship and blocked Plaintiff's ability to begin rideshare work. The South Dakota DSS correspondence at ¶ 51 reflects the connection Plaintiff alleges between the suspension, his subsequent housing loss, and E.H.'s redirection to the obligee.

73. Director O'Hayre's February 5, 2026 written response reaffirming the enforcement, after receiving Plaintiff's October 10, 2025 formal notice, supports Monell liability. Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986).

**The Claim**

74. Plaintiff incorporates by reference ¶¶ 49-54 (suspension events and financial-hardship notice), ¶¶ 55, 57-58 (formal notice and Johnston/O'Hayre responses), and ¶¶ 66-67 (Custom 2 and ratification).

75. Defendants deprived Plaintiff of his protected interest in his driver's license on multiple occasions — including June 2018, July 2023, December 2024, and April 2026 — without constitutionally adequate notice and a meaningful opportunity to contest the material grounds for suspension, pursuant to the administrative custom described at ¶ 66(2). Plaintiff does

not allege that Turner independently created a categorical right to an ability-to-pay hearing in every license-suspension proceeding; he alleges that, under Bell and Mathews, the procedures used were constitutionally inadequate in light of the unresolved order and accounting discrepancies, Defendants' actual notice of his circumstances, and the foreseeable consequences of depriving him of the means necessary to work and obtain payment.

76. As a direct and proximate result: Plaintiff lost his livelihood; lost E.H.'s planned placement with him; suffered two periods of homelessness totaling approximately seventeen months, from June 2023 through November 15, 2024 and from January 29, 2026 through May 29, 2026; and suffered economic damages in an amount to be determined at trial. Punitive damages are warranted against Johnston, Brant, Lucero, and O'Hayre in their individual capacities. Smith v. Wade, 461 U.S. 30 (1983). Larimer County is liable under Monell, 436 U.S. 658 (1978).

## COUNT II — PROCEDURAL DUE PROCESS: Enforcement Without an Entered Executable Predicate

### Fourteenth Amendment / 42 U.S.C. § 1983

### Against All Individual-Capacity Defendants and Larimer County

### The Constitutional Question

77. The Fourteenth Amendment prohibits the State from depriving any person of property without due process of law. Fuentes v. Shevin, 407 U.S. 67, 80 (1972). Plaintiff alleges that executive enforcement of a financial obligation without a valid entered underlying judicial order — or, in the alternative, contrary to the terms of the instrument Defendants themselves identify as their authority — deprives the obligor of property without the process due.

### What Defendants' Records State

78. The ICON Register of Actions for Case No. 2015DR000229 contains no child support order entry predating June 2, 2022, and the June 2, 2022 entry carries the "Child Support Order-1st" classification label. See ¶¶ 25, 39.

79. The Larimer County Records Department produced no 2015 child support order after a 34-day search. See ¶ 45; Exhibit 25.

80. Event ID 000031, entered June 2, 2022, carries "N/A" in the Authorizer field and lists $0.00 in arrears at a time when the FSR ledger reflected $6,638.00 outstanding. See ¶¶ 42-43.

81. Director O'Hayre identified the Separation Agreement — the document whose blank SSN fields correspond to the June 10, 2015 ICON rejection output — as the enforcement predicate. See ¶¶ 27, 58.

82. The Board of County Commissioners voted 2-0 to defend and indemnify the named defendants after being informed the dispute concerned "a child support order" without being informed that no order entry predating June 2, 2022 appears in the ICON register. See ¶ 60.

**What the Record Reflects**

83. The record reflects: (a) the June 9, 2015 minute order conditioned entry of the support orders on provision of the children's Social Security Numbers, and the June 10, 2015 system entry documents that the condition was not met; (b) Plaintiff alleges that, as a result, no separately entered, executable child support order in Case No. 2015DR000229 existed prior to June 2, 2022; (c) enforcement was nonetheless conducted using the Separation Agreement as the operative instrument rather than an entered court order, as O'Hayre stated in writing; (d) the June 2, 2022 ICON entry carries an "N/A" Authorizer field and a $0.00 arrearage figure, which Plaintiff alleges constitutes a material inconsistency requiring an audit trail and explanation; and

(e) the enforcement was formally ratified at both the agency and legislative levels after notice. Plaintiff alleges that because the support orders never ripened into entered orders prior to June 2, 2022, the signed June 2, 2022 modification order could not retroactively authorize the preceding seven years of enforcement, and that, as set out at ¶¶ 40-41, the signed order expressly did not adjudicate past-due support in any event. People v. District Court, 713 P.2d 918, 921 (Colo. 1986). Colorado law confirms that a child support enforcement authority must satisfy the mandatory statutory prerequisites before any enforceable support obligation arises. Adams Cnty. Dep't of Soc. Servs. Child Support Enforcement Unit v. Huynh, 883 P.2d 573, 574 (Colo. App. 1994). Plaintiff does not ask this Court to void any state-court order; he alleges only that the executive enforcement conduct proceeded without the entered predicate that Colorado law itself requires, or, in the alternative, contrary to the direct-payment and accounting terms of the instrument Defendants identify as their authority. See ¶¶ 4, 26.

**The Claim**

84. Plaintiff incorporates by reference ¶¶ 23-45 (predicate-order facts, including the Contrary-to-Instrument Track at ¶¶ 26, 40-41), ¶¶ 58, 60 (O'Hayre and BCC responses), ¶¶ 62-65 (Defendants' knowledge of the record and interstate contradictions), and ¶¶ 66-67 (Custom 1 and ratification).

85. From June 10, 2015 through June 2, 2022, Defendants enforced child support against Plaintiff without identifying a separately entered, executable child-support order containing the amount and enforcement terms used.

86. After June 2, 2022, Defendants continued enforcing a disputed preexisting arrears balance that the signed modification order expressly did not adjudicate, see ¶ 40, without

providing an accounting or meaningful process identifying the source, composition, payment credits, interstate adjustments, and legal determination establishing that balance.

87. Alternatively, if the Decree and incorporated Separation Agreement constituted the operative 2015 support instrument, Defendants departed from its direct-payment directive and have not identified the intervening judicial or administrative action that authorized the pre-2022 conversion to income withholding or resolved the inconsistent $1,028 and $1,128 obligation amounts. See ¶¶ 28, 26. Under either track, Defendants' enforcement resulted in net seizures of $37,337.42 documented in the Family Support Registry and two periods of homelessness totaling approximately seventeen months. Larimer County is liable under Monell because this enforcement custom was the moving force behind the deprivations and was formally addressed at both the agency and legislative levels after notice.

## COUNT III — PROCEDURAL DUE PROCESS: Modification Procedures and Exclusion of Actual Placement Data

### Fourteenth Amendment / 42 U.S.C. § 1983

### Against Defendants Jashinsky, Batts, Brant, Johnston, O'Hayre, and Larimer County

### The Constitutional Question

88. A modification procedure raises a procedural due process claim where it both (a) structurally excludes actual custody data from the calculation, and (b) takes so long to complete that the obligor is forced to pay an amount Plaintiff alleges was erroneous, in full, throughout the delay, with no interim relief. Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

### What Defendants' Records State

89. Director O'Hayre stated in her February 5, 2026 letter that the 2022 modified order was entered to "reflect the emancipation of your oldest child." The modification did not adjust for E.H.'s residential placement or R.H.'s documented periods of residence with Plaintiff.

90. Defendant Jashinsky stated in writing on July 7, 2022 that he credited the obligee with overnights for a child in residential treatment. Defendant Batts stated the agency does not "get involved in any parenting time issues" during modification proceedings. See ¶ 47.

91. From January 2022 through August 2023, Plaintiff's daughter E.H. was in 24/7 state-funded residential treatment while South Dakota designated Plaintiff as her adoption subsidy payee. See ¶¶ 46-48. During that same period, Defendants collected $12,440 from Plaintiff based on a worksheet calculation Plaintiff alleges did not reflect E.H.'s actual placement.

**What the Record Reflects**

92. Under Mathews v. Eldridge: the private interest is substantial — years of support calculations based on undocumented custody assumptions and a $12,440 collection during E.H.'s residential placement; the risk of erroneous deprivation is reflected in Defendants' own written statements excluding actual custody data from the modification process and in the extended time the agency took to complete the modification; and the government's interest in maintaining calculations inconsistent with documented custody facts is limited. Plaintiff signed the modification under financial circumstances that did not permit further delay: simultaneous license suspension, housing loss, E.H.'s placement change, and South Dakota collection actions. Plaintiff continued paying support for two months past R.H.'s 19th birthday, and provided employment verification for the obligee after the agency claimed it could not verify her employment during the modification process.

**The Claim**

93. Plaintiff incorporates by reference ¶¶ 46-48 (residential placement, worksheet, and $12,440 collection) and ¶¶ 49-54 (financial circumstances during the modification period) and ¶¶ 66-67 (Custom 3 and ratification).

94. Defendants applied a modification procedure that structurally excluded actual custody data, collected $12,440 from Plaintiff during E.H.'s residential placement based on that exclusion, and took an extended time to complete the modification while enforcing the unmodified amount in full. A reasonable official could not have relied on an admittedly incomplete custody record after Jashinsky's and Batts's own written statements disclosed that actual placement data was excluded from the calculation; that clearly established unlawfulness precludes qualified immunity. Hope v. Pelzer, 536 U.S. 730, 741 (2002). Larimer County is liable under Monell because the modification policy excluding parenting-time and placement data was the agency's official custom. This conduct contributed to the housing loss documented at ¶¶ 49-51 and to E.H.'s inability to come to Colorado.

## COUNT IV — SUBSTANTIVE DUE PROCESS: Conscience-Shocking Continuation of Coercive Enforcement After Actual Notice of Foreseeable Family, Housing, and Psychological Harm

**Fourteenth Amendment / 42 U.S.C. § 1983**

**Against Defendants Johnston, O'Hayre, and Larimer County**

### The Constitutional Question

95. The substantive component of the Fourteenth Amendment prohibits executive conduct that is arbitrary in the constitutional sense and shocks the conscience. County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). Plaintiff alleges that Defendants continued and reaffirmed coercive child-support enforcement after receiving actual notice that the enforcement had deprived Plaintiff of transportation necessary for employment, contributed directly to homelessness, and prevented the planned reunification of Plaintiff and his daughter.

### What Defendants' Records State

96. Before the July 2023 license suspension, Plaintiff informed Larimer County that his unemployment funds were exhausted, that he faced imminent homelessness, and that a valid driver's license was necessary for him to begin rideshare work. Defendants nevertheless suspended his license without first addressing that documented hardship. The suspension prevented Plaintiff from beginning that employment when he needed it to maintain housing for E.H.'s planned discharge to his home.

97. E.H. had been expected to leave residential treatment and reside with Plaintiff at the end of July 2023. After Plaintiff was deprived of the transportation and earning capacity necessary to stabilize his housing, the placement did not occur and E.H. was instead discharged to the obligee.

98. Plaintiff later provided Defendants formal written notice that the continuing enforcement had caused homelessness, severe psychological distress, and the loss of the planned placement. On December 2, 2025, Defendant Johnston acknowledged Plaintiff's reported crisis by directing him to the 988 Suicide and Crisis Lifeline. Johnston's response establishes actual knowledge of the severity of the reported harm. Nevertheless, Johnston initiated no review, audit, legal referral, hardship determination, or suspension of discretionary enforcement.

**What the Record Reflects**

99. On February 5, 2026, after reviewing Plaintiff's complaints, the agency record, and communications with agency personnel, Defendant O'Hayre formally concluded that the agency had acted appropriately. Enforcement continued. Plaintiff alleges that continuing and institutionally reaffirming coercive enforcement after actual notice that it had contributed to the loss of his transportation, earning capacity, housing stability, and planned reunification with his

daughter was deliberately indifferent to a known and foreseeable risk of profound harm and shocks the conscience. County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).

**The Claim**

100. Plaintiff incorporates by reference ¶¶ 49-54 (license suspension and hardship notice), ¶¶ 55, 57-58 (formal notice, Johnston's response, and O'Hayre's ratification), ¶¶ 62-63 (escalating notice), and ¶¶ 66-67 (Custom 4 and ratification). Plaintiff alleges that Defendants Johnston and O'Hayre received actual notice of enforcement-caused harm and continued the enforcement without meaningful review. A reasonable official could not have continued coercive enforcement, without pausing for review, after receiving Plaintiff's formal notice and Johnston's own acknowledgment of the reported crisis; that clearly established unlawfulness precludes qualified immunity. Hope v. Pelzer, 536 U.S. 730, 741 (2002). Larimer County is liable under Monell.

## COUNT V — FIRST AMENDMENT RETALIATION: Petitioning Activity

## First Amendment / 42 U.S.C. § 1983

## Against Defendant Lucero and Larimer County

**The Constitutional Question**

101. The First Amendment protects the right to petition the government for redress of grievances. State officials may not impose adverse enforcement actions in response to a citizen's exercise of that right.

**What Defendants' Records State**

102. On November 12, 2025, Plaintiff filed a state court motion requesting that the court identify the prevailing order, and directly transmitted that filed motion by email to Defendant Lucero the same day. Exhibit 30. On November 13, 2025 — one day later — Defendant Lucero

issued a manual payment demand. The present record identifies no intervening change in arrears, payment status, or other circumstance explaining the timing of the demand. See ¶ 56.

103. On March 17, 2026, the U.S. Marshals executed federal service. On March 18, 2026 — one day later — Defendant Lucero authorized a license suspension notice. The present record identifies no intervening change in arrears, payment status, or other circumstance explaining the timing of the suspension. See ¶ 59.

**What the Record Reflects**

104. The temporal proximity of one day between each protected petitioning act and each adverse enforcement action, combined with the absence of any identified intervening factual basis for either action, supports an inference of retaliatory causation. As to the November 2025 event, Plaintiff's direct email transmission of the motion to Lucero, Exhibit 30, establishes her actual notice rather than an inference based solely on her role in the case. As to the March 2026 event, Plaintiff alleges Lucero's knowledge of the federal service on information and belief, based on her role in the case and the timing of her action.

**The Claim**

105. Plaintiff incorporates by reference ¶¶ 56, 59 (petitioning activity and next-day adverse actions) and ¶¶ 66-67 (Custom 2 and ratification, as applied to license-related retaliatory conduct). Defendant Lucero issued adverse enforcement actions on November 13, 2025 and March 18, 2026, each one day after a discrete act of constitutionally protected petitioning activity, without an identified independent factual basis. A reasonable official could not have believed that issuing adverse enforcement action the day after a citizen's protected filing, absent any identified intervening factual basis, was lawful; that clearly established unlawfulness

precludes qualified immunity. Hope v. Pelzer, 536 U.S. 730, 741 (2002); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Larimer County is liable under Monell.

**COUNT VI — FAIR CREDIT REPORTING ACT: Willful Violations**

**15 U.S.C. § 1681n and § 1681s-2(b)**

**Against the South Dakota Division of Child Support (through Defendants Boyd and Rodig in their official capacities), the Colorado child support enforcement program operated through Larimer County, and Defendants Barnes and Althoff in their official capacities for prospective relief**

**The Statutory Framework**

106. A private right of action exists under 15 U.S.C. § 1681n and § 1681o for willful or negligent violations of 15 U.S.C. § 1681s-2(b). Section 1681s-2(b) imposes duties on a furnisher after it receives notice of a consumer dispute from a Consumer Reporting Agency (CRA): to conduct a reasonable investigation, review all relevant information provided by the CRA, and correct or delete inaccurate or unverifiable information. No private right of action exists under § 1681s-2(a); that subsection is not the basis for any claim in this Count. Liability for willful noncompliance, including reckless disregard of these duties, arises under § 1681n. Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 57 (2007).

107. Plaintiff incorporates by reference ¶¶ 30-34 (tradeline dates, dispute dates, and bureau responses).

**Furnisher Identification and State-Action Bridge**

108. The disputed tradelines were furnished by two governmental child support enforcement entities: the South Dakota Division of Child Support and the Colorado child support enforcement program operated through Larimer County. Defendant Spicciati, in his October 20, 2025 state-court filing captioned "The People of the State of Colorado, through Arthur J. Spicciati, Assistant Larimer County Attorney," stated that the local child support division

"represents the State of Colorado." See Exhibit 22 (Special Entry of Appearance and Notice of Intervention, May 11, 2022, entered on behalf of "The People of the State of Colorado" through the Larimer County Delegate Child Support Services Unit). Plaintiff alleges that Larimer County, by the representation of its own County Attorney, acts as the operational arm of the Colorado child support enforcement program that furnishes the disputed information, and may not simultaneously represent that it acts for the State to establish its enforcement authority while disclaiming furnisher status.

**The Factual Reporting Errors Subject to Investigation**

109. The disputed tradelines contain reporting features Plaintiff alleges are objectively verifiable from the record, distinct from any legal conclusion about contract validity: (a) Date Discrepancy — the Colorado tradeline reflects a "Date Opened" of June 9, 2015, one day before the June 10, 2015 ICON output identifying the missing statutory prerequisite; (b) Predicate-Order Discrepancy — the tradelines report a debt while the Register of Actions contains no child support order entry predating June 2, 2022; (c) Internal Delinquency-Date Anomaly — the Equifax tradeline reports a "Date Opened" of June 9, 2015 but a "Date of First Delinquency" of June 30, 2025; and (d) Truncated Review Window — the Equifax tradeline reports "Months Reviewed: 44," a window extending back only to approximately November 2021 rather than to the reported 2015 origin date, with the "Date of Last Activity" field left blank.

**Violation Event 1: Failure to Investigate After November 2022 Dispute — South Dakota Division of Child Support (Experian)**

110. On or about November 2022, Plaintiff disputed the South Dakota Division of Child Support tradeline through Experian. Bureau: Experian. Furnisher: South Dakota Division of Child Support (Account 326684XXXXXX). Experian conducted a reinvestigation, contacted the furnisher, supplied the furnisher the dispute information, and instructed the furnisher to verify

accuracy. On November 18, 2022, Experian issued dispute results (Report Number 4125-0074-23) reflecting that the furnisher certified the information as accurate and that the item "Remains" unchanged. Plaintiff alleges the furnisher certified accuracy without correcting the reporting features identified in ¶ 109. Alleged violation: 15 U.S.C. § 1681s-2(b); § 1681n.

**Violation Event 2: Failure to Investigate After April 2025 Dispute — Colorado Child Support Enforcement Program (Experian)**

111. On or about April 2025, Plaintiff disputed the Colorado child support tradeline through Experian. Bureau: Experian. Furnisher: Colorado Division of Child Support (Account 143520XXXXXX). Experian conducted a reinvestigation, contacted the furnisher, supplied the furnisher the dispute information, and instructed the furnisher to verify accuracy. On April 7, 2025, Experian issued dispute results (Report Number 0414-6940-52) reflecting that the furnisher certified the information as accurate and that the item "Remains" unchanged. Plaintiff alleges the furnisher certified accuracy without correcting the reporting features identified in ¶ 109. This is the second occasion on which a child support furnisher certified the same category of reporting feature as accurate following a CRA-transmitted dispute. Alleged violation: 15 U.S.C. § 1681s-2(b); § 1681n.

**Violation Event 3: Failure to Investigate After June 11, 2026 Dispute — South Dakota Division of Child Support (TransUnion)**

112. On June 11, 2026, Plaintiff disputed the South Dakota child support tradeline through TransUnion. Bureau: TransUnion. Furnisher: Dept. of Child Support / Dept. of Social Services, Yankton, South Dakota (Account 32668401XXXX) — the same South Dakota tradeline addressed in Violation Event 1. TransUnion conducted a reinvestigation and, on June 30, 2026 (File Identification Number 000346223918), issued dispute results reflecting that the furnisher certified the account "VERIFIED AS ACCURATE." Exhibit 32. The TransUnion

tradeline reports a "Date Opened" of May 9, 2017, a $0 balance, a "Pay Status" of "Transferred; was Paying as agreed," and a "Date Closed" of March 31, 2021. Plaintiff alleges these fields are objectively inconsistent, on their face and without regard to any legal conclusion: (i) the reported May 9, 2017 opening date conflicts with the June 9, 2015 opening date the same underlying obligation carries on the Colorado tradeline furnished to Experian, see ¶ 109(a); (ii) a zero balance and "closed"/"transferred" status as of March 2021 is inconsistent with continuing collection activity and an active, growing balance reported on Plaintiff's credit file during and after that period, including the $15,049 outstanding balance and 120-plus-day delinquency the Equifax tradeline reported as of February 2026, see ¶ 34; and (iii) the account this tradeline reports as closed and transferred in 2021 is the same account South Dakota certified as accurately reported, unchanged, in response to Plaintiff's November 2022 Experian dispute, see ¶ 110, a certification inconsistent with the closed/transferred status TransUnion separately reports for the same account. Plaintiff further alleges the furnisher certified this account as accurate without correcting the defect alleged throughout this Complaint: that the present record contains no evidence a Colorado order was ever registered in South Dakota under UIFSA, and that South Dakota at no time held jurisdiction or a valid entered judicial predicate authorizing the reporting of a child-support obligation against Plaintiff. See ¶¶ 35, 109(b). Alleged violation: 15 U.S.C. § 1681s-2(b); § 1681n.

**Background Facts Bearing on Damages**

113. The February 2021 and September 2021 TransUnion reporting events described at ¶ 33, and the continued presence of the Equifax tradeline described at ¶ 34, are alleged as evidence of the scope and duration of the credit harm Plaintiff suffered. Plaintiff does not plead these

events as independent violations of § 1681s-2(b) absent a CRA-transmitted dispute specific to each event, and reserves the right to amend if discovery establishes such a dispute occurred.

**The Claim**

114. Each violation event identified in ¶¶ 110-112 constitutes a discrete actionable violation under § 1681s-2(b). On three separate occasions — November 18, 2022, April 7, 2025, and June 30, 2026 — a child support furnisher received a CRA-transmitted dispute and certified the information as accurate ("Remains" or "Verified as Accurate") without correcting the reporting features identified in ¶¶ 109 and 112. Plaintiff alleges this conduct reflects reckless disregard of statutory investigation duties within the meaning of Safeco, 551 U.S. at 57. The reporting contributed to the suppression of Plaintiff's FICO score to 461, impaired his ability to secure stable housing, and contributed to the periods of homelessness described herein. Plaintiff seeks statutory damages for each discrete violation event, actual damages, punitive damages, and permanent injunctive relief compelling deletion or correction of the affected tradelines. 15 U.S.C. § 1681n; § 1681o.

**COUNT VII — MONELL LIABILITY: Unconstitutional Customs and Ratification**

**42 U.S.C. § 1983**

**Against Larimer County, Colorado**

**The Constitutional Question**

115. A municipality is liable under § 1983 when an official policy or custom is the moving force behind a constitutional violation. Monell v. Dep't of Social Services, 436 U.S. 658 (1978). A decision by an official with final authority over the particular subject matter, made or ratified after notice, constitutes official policy. Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986).

**What Defendants' Records State**

116. The following written statements and official acts by Larimer County officials establish the existence and ratification of the enforcement customs described at ¶ 66: (1) Brant's February 5, 2025 statement that enforcement is based exclusively on "policy and procedures" — supporting Customs 1 and 2; (2) Batts's statement that the agency does not "get involved in any parenting time issues" — supporting Custom 3; (3) O'Hayre's February 5, 2026 written response reaffirming the enforcement after formal notice — supporting approval and continuation of Customs 1, 2, and 4 by an official Plaintiff alleges, on information and belief, possessed final authority over the challenged enforcement review; and (4) the Board of County Commissioners' March 24, 2026 vote to defend and indemnify the named defendants — supporting institutional notice of this action.

**What the Record Reflects**

117. Plaintiff alleges that Brant's statement identifies the custom, that O'Hayre exercised final County authority over Plaintiff's administrative challenge and expressly approved its application, and that the Board of County Commissioners received institutional notice, accepted responsibility for the defense and indemnification of the County actors, and took no corrective action. Plaintiff alleges the challenged injuries were caused by Larimer County's own enforcement policies and discretionary decisions — not merely by the passive existence of state child-support statutes. State law supplied available enforcement mechanisms; Plaintiff alleges County policy determined how and against whom those mechanisms were deployed, including the selection of remedies, the data used in modification calculations, the handling of hardship information, and the decision whether to investigate after notice. The materially contradictory statements by Martens, Brant, and Johnston concerning which government controlled the case,

see ¶¶ 64-65, further reflect that Larimer County exercised independent discretion rather than merely executing another state's directives.

**The Claim**

118. Plaintiff incorporates by reference ¶¶ 66-67 (four customs and ratification chain), ¶¶ 62-65 (knowledge of the record and interstate contradictions), and the specific paragraphs identified in Counts I-V as supporting each custom.

119. Larimer County's four unconstitutional customs, addressed by final County authority after notice, were the moving force behind the constitutional violations alleged herein, the $37,337.42 in unlawful seizures, and Plaintiff's two periods of homelessness totaling approximately seventeen months. Larimer County is directly liable for compensatory damages under Monell.

## VI. PRAYER FOR RELIEF

120. WHEREFORE, Plaintiff Gerald Paul Hershfeldt respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

**A. Declaratory Relief**

121. A declaration pursuant to 28 U.S.C. § 2201 that Defendants' child support enforcement actions from June 2015 through the present were conducted without a lawful entered judicial predicate, or, in the alternative, contrary to the terms of the instrument Defendants identify as their authority, and in violation of the Fourteenth and First Amendments and the FCRA. Plaintiff does not ask this Court to declare any state-court order void ab initio or overturn any state-court judgment.

**B. Prospective Injunctive Relief**

122. Permanent injunctive relief enjoining Defendants in their official capacities from executing further wage garnishments, tax intercepts, and driver's license suspensions in the absence of a valid entered judicial order and constitutionally adequate process.

123. An order compelling the correction or deletion of all child support tradelines furnished by Defendants to consumer reporting agencies that reflect the circumstances alleged in Count VI.

**C. Restitution**

124. An order of restitution in the amount of $37,337.42, representing the net funds seized from Plaintiff as documented in the Family Support Registry Complete Payment Record for Account XXXXX17-01, including the $12,440 collected during January 2022 through August 2023 as alleged in Count III.

**D. Compensatory Damages**

125. Compensatory damages against all individual-capacity Defendants and Defendant Larimer County in an amount to be determined at trial for: destruction of economic capacity; loss of livelihood; loss of E.H.'s planned placement with Plaintiff; two periods of homelessness totaling approximately seventeen months (June 2023 through November 15, 2024, and January 29, 2026 through May 29, 2026); severe emotional distress; mental anguish; and loss of enjoyment of life.

**E. FCRA Statutory and Actual Damages**

126. Statutory damages pursuant to 15 U.S.C. § 1681n for each of the discrete violation events identified in Count VI (¶¶ 110-112), and actual damages pursuant to 15 U.S.C. § 1681o, in amounts to be determined at trial.

**F. Punitive Damages**

127. Punitive damages against the individual-capacity Defendants in an amount to be determined by a jury, sufficient to punish and deter the deliberate indifference and knowing disregard of clearly established constitutional rights described herein. 42 U.S.C. § 1983; 15 U.S.C. § 1681n; Smith v. Wade, 461 U.S. 30 (1983).

**G. Attorney's Fees and Costs**

128. Reasonable costs of litigation and attorney's fees pursuant to 42 U.S.C. § 1988 and 15 U.S.C. § 1681n(a)(3), should Plaintiff retain counsel.

**H. Additional Relief**

129. Such other and further relief as this Court deems just, proper, and equitable.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all claims so triable.

## AI CERTIFICATION

Pursuant to Judge Nina Y. Wang's Standing Order Regarding the Use of Generative Artificial Intelligence in Court Filings, the undersigned certifies that generative artificial intelligence was used to assist in drafting this filing. The undersigned further certifies that the filing was personally reviewed for accuracy and that all legal citations reference actual non-fictitious authority.

## VERIFICATION

I, Gerald Paul Hershfeldt, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am the Plaintiff in the above-captioned matter; that I have read the foregoing Second Amended Complaint; and that the factual allegations contained herein are true and correct to the best of my personal knowledge and belief, except as to matters alleged on information and belief, which I also believe to be true.

**Respectfully submitted this 25th day of July, 2026.**

/s/ Gerald Paul Hershfeldt
GERALD PAUL HERSHFELDT
Pro Se Plaintiff
429 E. 14th Ave. #107
Denver, CO 80203
720-378-8474
jerry.hershfeldt@gmail.com